## Wolf *against* Goddard.

In an action of ejectment for lands, certified copies of the returns of survey are made evidence by act of assembly and should always be received as *prima facie* evidence of the lands taken upon the warrants.

The authority of the agent of a corporation to give notice to their tenant to quit possession of their lands need not be under seal.

A plaintiff could not maintain ejectment for a tract of uncultivated land merely because his name is the same as that used in the warrant; he must be identified by evidence of his having paid for the warrant, or procured the survey to be made, or paid the purchase money:—and if it appear that another person paid the purchase money and procured and paid for the survey, the name will not give title against the purchaser who bought and paid for the land, even if the plaintiff show that he wrote the application.

When a corporation sues in its own name to recover lands, it must be prepared to show its charter of incorporation, but this is not so when the legal title is in trustees for the corporation and the suit is in their name.

ERROR to the common pleas of *Lebanon* county.

John Goddard, Charles Bird, Joseph M. Eldridge, Benjamin Kugler, and Paul Beck, Jr.; in trust for the Dauphin and Susquehanna Coal Company, against Jonathan Wolf, George Hamer, Jacob Seiler and Philip German. This was an action of ejectment for two tracts of land in Dauphin county. The facts of the case and the various bills of exceptions are sufficiently stated in the opinion of the court.

*Kline* and *Weidman*, for plaintiff in error.

*J. A. Fisher*, for defendant in error.

The opinion of the court was delivered by

HUSTON, J.—The defendants here were plaintiffs below, and brought this ejectment to recover two tracts of land surveyed on two warrants dated each 3d of April 1794, in the names of Martin Moyer and Conrad Moyer, and surveyed to contain 437 acres 90 perches and 426 acres 93 perches.

The writ was served on Jonathan Wolf, in possession. The other defendants admitted to defend as landlords.

The surveys were made on two of one hundred warrants, the leading one in the name of Joseph Hiester, made by B. Galbraith in June 1795, not returned by him but returned in 1806 by Levi G. Hollingsworth his successor in office. To certified copies of these returns being admitted in evidence, exceptions were taken. This was according to a bad practice, in this district, of taking a bill of exceptions to every thing. They were evidence by act of assembly and universal decision. To be sure not conclusive but *prima*

*facie*, and it is not easy to conceive of a case in which the office copies of warrants and surveys are, not admissible in evidence— there are cases in which their effect in giving title to the party claiming them may be impugned.

The plaintiffs next proved the payment of the purchase-money on the hundred warrants to the state by James Wilson.

Then offered from the recorder's office of Dauphin county, the certified copy of a mortgage of these one hundred tracts, by James Wilson to Kearny Wharton and four other men, dated 5th of August 1795. This was proved on 3d of July 1796 and recorded 8th of July 1796. This was excepted to.

After shewing the commissions from the surveyor general to Bartram Galbraith, dated 8th of November 1791, and to Levi G. Hollingsworth, dated 22d of October 1804, the plaintiff next offered the *scire facias* on this mortgage No. 80 of March term 1802, and judgment and sale to Thomas Duncan, attorney for John Mastors and deed by Samuel Elder, sheriff, reciting a sale on 16th of October 1802, (deed dated and acknowledged in court 16th January 1803) of 29,600 acres the above lands.

The plaintiffs then gave in evidence several deeds deducing the title to John Goddard, Charles Bird and Joseph M. Eldridge. All these were also objected to. Nothing like a reason for the exception was given, except that although their warrants had been surveyed in June 1795, the surveys had not been returned on the 5th of August 1795 the date of the mortgage. But James Wilson being the owner of the applications, having paid the state for the warrants and, as we must take it, having procured surveys to be made on them, had an interest which would have been bound by a judgment and could be mortgaged. To be sure the title was not complete till the return of survey, and might by great lapse of time be lost, for want of return, if a third person on a fair and legal presumption of abandonment had made another purchase, from the state, of the lands. But the interest of James Wilson being transferred by the sale on the mortgage gave to the purchaser a right to have the surveys returned, as was done in this case.

The plaintiff next offered three warrants and surveys in the names of William Stuart Jr., and Peter Hamer, Jr., all dated 18th of June 1794, and surveyed 21st of June 1795 by John Weidman deputy surveyor; it was stated, proved and admitted that two of these covered the same ground as the two warrants in the names of Moyer first drawn—they also offered articles of agreement 27th of December 1794 between Wm. Stewart and James Wilson by which several agreed to sell these last three tracts to James Wilson, and to procure and deliver deeds poll to Wilson, and also showed that Wilson paid the purchase-money to the state on these last three warrants. Three deeds poll from the three warrantees were also produced, conveying the last three tracts to James Wilson and the handwriting of the subscribing witness was proved. The deeds

[Wolf v. Goddard.]

poll were found in the land office. All this was objected to and admitted. To understand this part of the case we must state that before 1794 John Weidman had been appointed deputy surveyor of certain townships in Dauphin county. The northern line of those townships being through an uncultivated and mountainous region, had not been run or marked until many years after 1794, hence the division line in that part between the districts of B. Galbraith and Capt. Weidman was not precisely known, and some how it happened that three warrants, the property of James Wilson as surveyed by Galbraith, and the other three warrants also the property of James Wilson as surveyed and returned by Weidman covered the same ground, so that although he owned six warrants he got only three tracts of land. On former occasions much time had been spent in referring to records and examining witnesses to prove whether lands in dispute lay in the one district or the other; this testimoney was offered to show that, whether it lay in the one district or the other, it was James Wilson's, and it was asserted that it was bound by the mortgage and passed by the sale, and rightly asserted, and although it might in most cases have been more regular to have reserved this as rebutting evidence after defendants had made objection to plaintiff's title under the Moyer warrants, yet in this case it was excusable, if not strictly right in the court to admit it in this stage of the case.

Another objection was that the three deeds poll from the last three warrantees, were found in the possession of the secretary of the land office. An officer who first went into that office in 1809, proved that when he entered that office, there were many bundles of deeds poll to James Wilson. It was necessary to produce these, in order to obtain patents. In most cases, the persons who sold discoveries of vacant land to capitalists, bound themselves to furnish deeds poll for patenting—lodging these in the office for James Wilson, or giving them to James Wilson, and he sending them to the office, was in effect the same thing. There was no error in permitting them to go to the jury who might presume a delivery to him or to the office for his use—either would be equally good.

The sixth bill of exceptions was properly waived by the counsel. The seventh bill arose on this point:—after the title had been deduced to John Goddard, Charles Bird, and Joseph M. Eldridge, and from them to a third person, and from him to the plaintiffs in trust for the Dauphin and Susquehanna Coal Company, and had proved the payment of taxes since about 1829, when the present owners came in, and having proved that possession was taken, and houses built and work done by the agents of the company, and a parole lease to Jonathan Wolf, who had since taken a lease from the defendants, offered a notice to Jonathan Wolf to quit, signed by Wm. Ashton, agent. This was objected to because the authority of Ashton as agent was not produced under

[Wolf v. Goddard.]

seal, and some authorities were produced to show that in England the power to give such notice to the tenants of a corporation must be under seal. The court admitted the notice to be read. The old law as to what acts of a corporation must be under seal, is changed by constant usage, and I may say from necessity. We have so many corporations, carrying on almost every kind of business, by agents, that it would be impossible to put the seal even by a patent engine, to every contract made by every agent of some of our corporations. It is believed that among all the banks in the United States, not one cashier is authorised under seal to sign notes or bills. I need not refer to decisions; but this is a totally immaterial matter, for as Jonathan Wolf had attorned to the defendants and denied the tenancy, no notice was necessary.

The common pleas directed the jury that it was immaterial whether the title under Moyer or the three warrants from Stewart was the best, and also that although Wilson mortgaged the land as held under the Moyer warrants, and afterwards received deeds poll from William Stewart and Hamer, yet those deeds enured to the use of the mortgagee. "Where a man has a defective title to land," says the Judge, "and conveys it to another, and subsequently obtains the better and undoubted title to the premises thus conveyed, the entire title passes to his grantee under the first conveyance, and this upon principles of common honesty and justice." There is no doubt of the soundness of this doctrine. The court adds a limitation or restriction, not necessary to be discussed in this case, where the second title is conveyed to a *bona fide* purchaser, without notice of the first conveyance, and without the first conveyance being recorded. I repeat, it is not proper to say any thing in this case on this point.

The defendants called a person named Peter Hamer, who on seeing the deed poll in that name to James Wilson, swore he never executed it. He admitted, however, that he had heard of another man of the name of Peter Hamer; that he, the witness, was a minor in 1794 and 1795; he did not pretend that he entered the application, or paid the state the purchase-money, or superintended, or procured, or paid for the survey. The court properly threw all this out of the case; it was worse than a useless waste of time. The witness had no more right to the land than any other person in the court house. The law and practice on this matter is not precisely settled; but it will come to this:—That no person shall be able to recover a tract of land *merely because his name is the same as that used in the warrant.* I speak of land not cultivated; but it will be held necessary that such plaintiff shall also show that he paid for the warrant, or procured the survey, or show some more title to it than that it is in the same name as the plaintiff. Nay more, if he shows that he wrote the application, yet if it appears that another person paid the purchase-money, and

procured and paid for the returns of surveys, the name alone will not give title against the purchaser who bought and paid for the land.

I must now go back to trace the title of plaintiffs more particularly, after the title had been brought to John Goddard, Charles Bird, and Joseph M. Eldridge.—Those gentlemen on the 18th day of March 1828, conveyed the same to Harvey Beck and to his heirs and assigns in fee simple for the consideration as expressed in the deed of 20,000 dollars.

On the 19th of March 1828, a deed in tripartite was executed between Harvey Beck of the first part, John Goddard, Charles Bird, Joseph M. Eldridge, Benjamin Kugler and Paul Beck, Jun. of the second part, and the Dauphin and Susquehanna Coal Company of the third part. This deed recites a consideration of 20,000 dollars paid by the party of the third part, and a consideration of one dollar by the parties of the second part, for which the party of the first part conveys to the parties of the second part and to the survivors and survivor of them, &c, thirty-nine tracts of land surveyed in the names of Joseph Heister, Martin Moyer, Conrad Moyer, John Shæffer, Elizabeth Koons and others, named, containing 16,213 acres, 81 perches and allowance, be the same more or less, being 39 of the 74 tracts of land, granted in the preceding deed to Harvey Beck: "To have and to hold the said thirty-nine tracts, pieces or parcels of land, hereditaments and premises hereby granted or mentioned and intended so to be with their respective appurtenances unto the said parties of the second part hereunto, and the survivors and survivor of them, and the heirs and assigns of such survivor of them, to and for the only proper use and behoof of the said parties of the second part hereto and the survivors and survivor of them, and the heirs and assigns of such survivor of them forever, in trust nevertheless to grant and convey to and for the use and behoof of the said The Dauphin and Susquehanna Coal Company, their successor and assigns, the whole or any part or parts of the aforesaid thirty-nine tracts or pieces of land, or such subdivided portions thereof as the said The Dauphin and Susquehanna Coal Company may hereafter from time to time select, and by deed under their corporate seal require the said trustees and the survivors and survivor of them to convey, and in such quantities as the said corporation may by law at the periods respectively of such requisitions be authorised to hold. Provided *that such requisition or requisitions shall be made by the said company, before the first Monday of March, which will be in the year of our Lord one thousand eight hundred and forty-one.* And in relation to such part or parts of the said thirty-nine tracts as may not as aforesaid be selected by the said The Dauphin and Susquehanna Coal Company, and accordingly conveyed to it, To have and to hold the said residue of the thirty-nine tracts, to the only proper use and behoof of the said John God-

[Wolf v. Goddard.]

dard, Charles Bird, Joseph M. Eldridge, Benj. Kugler and Paul Beck, Jun., their heirs and assigns, as tenants in common, and not as joint tenants, in the following proportion, that is to say, five twentieth parts thereof unto the said John Goddard, his heirs and assigns, six twentieth parts thereof unto the said Charles Bird, his heirs and assigns, five twentieth parts thereof unto the said Joseph M. Eldridge, his heirs and assigns; two twentieth parts thereof unto the said Benj. Kugler, his heirs and assigns, and the remaining two twentieth parts thereof unto the said Paul Beck, Jun., his heirs and assigns. And this indenture further witnesseth that the said John Goddard, Charles Bird, Joseph M. Eldridge, Benjamin Kugler and Paul Beck, Jun., for themselves, their heirs, executors and administrators, (each for himself, and not one for another,) hereby covenant, grant and agree, to and with the said The Dauphin and Susquehanna Coal Company, their successors and assigns, that they, the said John Goddard, Charles Bird, Joseph M. Eldridge, Benjamin Kugler and Paul Beck, Jun., and the survivors and survivor of them, and the heirs of such survivors will from time to time, hereinafter and as often before the said first Monday in March, which will be in the year of our Lord one thousand eight hundred and forty-one, as they may be required, by deed unto the corporate seal of the said The Dauphin and Susquehanna Coal Company, grant and convey in fee simple or other less estate to the said the Dauphin and Susquehanna Coal Company, by such assurances in law, as may be necessary to vest the same in the said company, as they may reasonably require such part or parts of the said thirty-nine tracts or pieces of land, or such subdivided portions thereof as the said company may so require, and may by law be authorized to hold or enjoy at the time of such requisition or requisitions, respectively. On the 22d of March 1830, John Goddard, Charles Bird, Joseph M. Eldridge, Benjamin Kugler and Paul Beck, Jun., having paid to the commonwealth 11 dollars 62 cents, the arrearages of purchase-money and interest and 10 dollars, the patenting fees, obtained from the commonwealth a patent for the tract of 437 acres and 70 perches, surveyed in pursuance of a warrant of the 3d April 1794, issued in the name of Martin Moyer, and on the same day, having paid the sum of 8 dollars 88 cents, the arrearages of purchase-money and interest, and 10 dollars, the patenting fees, they obtained from the commonwealth a patent for the tracts of 426 acres and 93 perches, surveyed in pursuance of the warrant of the 3d April 1794, issued in the name of Conrad Moyer.

These patents recite the grant of the warrants to Martin Moyer and Conrad Moyer, whose rights in and to the said tracts of land, by virtue of sundry conveyances, and other assurances in law, became vested in the said John Goddard, Charles Bird, Joseph M. Eldridge, Benjamin Kugler and Paul Beck, Jun., in trust, nevertheless, for the Dauphin and Susquehanna Coal Company, agreeably to a certain deed of trust, executed by Harvey Beck, dated the

IX.—2 w

[Wolf v. Goddard.]

19th of March, 1828, and grants the same "to have and to hold the said tracts or parcels of land, with the appurtenances, unto the said John Goddard, Charles Bird, Joseph M. Eldridge, Benjamin Kugler and Paul Beck, Jun., in trust for the Dauphin and Susquehanna Coal Company, and their assigns, to the use of them, the said John Goddard, Charles Bird, Joseph M. Eldridge, Benjamin Kugler and Paul Beck, Jun., and their assigns for ever, in trust, nevertheless, for said company. By the act of the 5th of April, 1826, entitled an act to incorporate the Dauphin and Susquehanna Coal Company, it is provided "that the company shall hold no lands except they are situate on Short Mountain, or on Stoney Creek, and that the quantity of land to be held by said company shall not at any time exceed 10,000 acres.

A corporation is an artificial body, created by law, and deriving, in this country, all its powers and authorities from the law creating or erecting it. It can exercise no power or authorities, it can hold no estate or property, except such as are conferred or authorised by the law, or those necessarily incident to the powers and authorities thus granted, and in estimation of law part of the same. There was a time in England, when in matters of construction every intendment was made in favour of corporations, and the courts studied, to extend rather than restrain the meaning of terms, granting corporate rights and privileges, and this upon the principle, that their design is to provide some good that is useful to the public, and that through their instrumentality the people regained from the crown some portion of those rights of which it had possessed itself. If the franchise ceased, it reverted to the crown, which was thus strengthened against the people. But this doctrine either never has, or never ought to have prevailed here, at least, since the 4th of July 1776, because here the people are the only legitimate source and depository of power, and whatever is given to an association of individuals, is so much abstracted from the *rights of the citizens at large*, and when those rights are forfeited from any cause, they revert to the community at large. And for the multiplication of corporations, the rule of late years has been changed in England, and is the same as that which exists in this country, viz: that in the construction of grants of corporate rights, a *strict rule* must prevail, and that all legitimate presumptions must operate in favour of the public rather than in favour of the corporation. Still giving this rule its full and legitimate operation and effect, it must not operate to prevent a corporation from having and enjoying all that is granted to it by law.

The lands in this case have not been granted to the corporation itself by the deeds of conveyance, but are granted to trustees, the consideration money being paid by the corporation, and if the grant had been of the whole lands mentioned and described in the deed executed by Harvey Beck, on the 19th of March 1828, in absolute trust for the company, the court is of opinion, that such grant would

[Wolf v. Goddard.]

have been in violation of the provisions of the charter of incorporation, and that the lands could not be so held for the company in any greater quantity or in any other location than that allowed by the charter of incorporation. For a corporation created by an act of the legislature of our commonwealth, cannot indirectly or through the intervention of trustees, hold any other lands, or any greater quantity of lands than the charter of incorporation authorizes it to hold directly. There, however, the meaning of the trust evidently is, and such the court tell you is the legal construction of it, that the trustees hold the legal title of the land in trust, to permit the corporation to select therefrom such parts or portions as in the whole shall not exceed the quantity which by law it is authorised to hold. And there is nothing to show that, including the lands in dispute, they have selected or hold more than is authorised by law. Having disposed of this objection as to quantity, the next question is whether the lands in dispute are within the location authorised by law. They are clearly not on Stoney creek—that is conceded on all hands. Are they "situated on Short Mountain?" On this subject there has been a good deal of evidence. The witnesses familiar with the mountains at the Susquehanna river, all consider the Short mountain as commencing east of the Susquehanna, between Stoney creek on the south, and Clark's creek on the north, and extending eastward until the mountain divides into the Sharp mountain, and the Fourth mountain, in the neighbourhood of the Schuylkill county line, and as several of them say, east of that line, and that its name of Short Mountain is derived from the circumstance of its falling short of the river in its termination, whilst the other ranges of mountains are cut by that river and extend in ranges on the western side of it.

On the other hand, the witnesses familiar with the region of country, at, and east of the Schuylkill county line, who, in the great coal formations of that county, have been in the habit of tracing the ranges in a western direction, carry on the various ranges of the Sharp or Southern coal mountain, the mine hill and the Broad mountain, or Fourth mountain, as it is sometimes called, by their respective names until they are lost or converged in each other, so as no longer to be at all distinguishable at or near the county line, or as they suppose, west of it in Lebanon county, and it is very probable, that in perfect sincerity, each may suppose himself right in calling the range as it converges by the name of the Short mountain on the one hand, and the Sharp, (or third) and the Fourth mountain on the other. One set treating it for some distance as one mountain, and the other set treating it as two, and able even to trace the ranges of rock peculiar to each, in the ledges approximating to each other.

Mr Weidman, in the description furnished to the commissioners in 1797, describes these tracts as "between the third and fourth blue hills, on the waters of Fishing and cold spring creeks. Cold

Spring creek is a branch of Stoney creek, and his field notes call for it as between the Third and Fourth mountains.

In the application for the William Stewart warrant, the land is described as bounded by the Berks county line, north of the second mountain, and east of Wisconisco valley. And you will find upon one of the diagrams produced by the plaintiffs, that the Sharp mountain, as well as the Fourth mountain, are laid down on these lands.

The court instruct you, that if the term "Short mountain," in the act of assembly might be understood at the time of the passage of the law, by those who asked for it, and those who enacted it, as embracing the mountain beginning near the Susquehanna, and extending to the Schuylkill county line, although in the neighbourhood of the said line it may have been called by other names, and if the company might in good faith have so considered it in making the purchase of this land, that even, if strictly in error as to the appropriate name at that point, it would not be such a violation of the term of their charter as would violate their title or prevent them from recovery, if otherwise legally entitled to recover.

The appropriateness of the location is for you to determine, of course, under this explanation of the law. If, however, it was clearly no part of the Short mountain, then the plaintiffs could not recover, and this is a question of fact for you to decide.

If you decide the matter in favour of the plaintiffs, then there are some further matters of inquiry.

The most important of these, perhaps, is the character in which Jonathan Wolf entered into possession of the tract of 437 acres 70 perches and allowance, warranted in both the names of Martin Moyer and William Stewart. If the testimony of Jacob Wolf is believed by you, then it would seem that Jonathan entered into possession of the tract under the plaintiffs, either as their agent or as a tenant, and if he did enter in either of those capacities, he cannot hold the possession against them without having first by an unequivocal act divested himself of his character of agent or tenant. He cannot, whilst living upon the land under them, take a lease from a third person, who may have even a better title than the plaintiffs, and under such title defend his possession. If he had doubts as to the propriety of living under, and recognizing the plaintiffs' title, he should have told them so, delivered up the possession to them, or have left the premises, giving them notice either of his intention so to do, or of having done so, and then, if after he had done so, and the possession had remained vacant such a length of time as to have fully enabled the plaintiffs to take possession, he might re-enter under another title, but clearly not then, if there were any reasonable doubts about his having given the plaintiffs an opportunity of resuming their rights upon the premises.

If Jonathan Wolf cannot defend against the plaintiffs, in consequence of being their agent or tenant, neither can those who come

[Wolf v. Goddard.]

in and are permitted to take defence as his landlords. They will be in no better position than he is. The defendants however contend that they have impeached Jacob Wolf's testimony by showing that in several matters in relation to which he testified, he has given different accounts, from those detailed by him in his evidence before this court. That if a lease really had existed, Mr Lyon on behalf of the company, would not have gone to Jonathan Wolf in the fall of 1838, and asked him to execute a written lease and thus become the tenant of the Dauphin and Susquehanna Coal Company, nor when Jonathan refused, would he have gone to Jacob Wolf and urged him to endeavour to procure such a lease to be executed by Jonathan Wolf.

This matter of credibility of witnesses, is exclusively for you. A witness, whose character is unimpeached and swears positively to a fact, should not lightly be discredited. Yet a witness may be discredited by showing a discrepancy in his statements, by showing facts wholly irreconcilable with what he has testified, as well as by the testimony impeaching his character for truth and veracity.

It is alleged by the defendants that if Jonathan Wolf was the tenant of the Dauphin and Susquehanna Coal Company; if what took place between Jacob and Jonathan, constituted the latter a tenant, it amounted to the lease from year to year at will, and he was entitled to three months' notice to quit before the end of the year. Or if he was the sub or under-tenant of Jacob, he was entitled to that notice to quit from Jacob, from whom he rented. The first of these positions may be conceded, but as to notice as an under tenant from his immediate landlord, the real landlord is not bound to look beyond his immediate lessee, unless he has recognized the sub-lessee as tenant. But it is for you to say whether, if Jacob did let to Jonathan, he did not do so as agent of the company, and if so, it would not be an underletting at all. But if Jonathan were tenant to the company, either as lessee or sub-lessee, and whilst such relation subsisted, took a lease from a third person, he by such act cast off the character of tenant, so far at least as relates to notice to quit, and is immediately liable to an action of ejectment. Here, however, it appears that a notice to quit by the agent of the company, was served upon the defendant Jonathan Wolf, upon the 11th day of July 1837, and the ejectment was not brought until the day of January 1838. And it also appears that on the 10th day of May, 1837, Jonathan Wolf, by lease, became the tenant of these premises, to George Hamer for a year, from the 1st of April 1837, which lease on the 26th of March 1838, he renewed for another year, and he therefore cannot defend himself in this ejectment by endeavouring to resume his character as tenant of the Dauphin and Susquehanna Coal Company, without resuming it in full. He cannot blow hot and cold.

IX.—2 w*

[Wolf v. Goddard.]

The defendants, it will be observed, have not set up any title in themselves, but rely on the alleged defects of the plaintiff's title and their alleged inability to recover.

It is a well established principle, that the plaintiff in ejectment must recover on the strength of his own title and not on the want of title of the defendant, except in the case of a person defending who is in his possession under the plaintiff. In such a case a tenant cannot dispute the title of him under whom he enters, unless such plaintiff be prohibited by law from recovering.

" In the act incorporating the company before referred to, Benjamin Kugler, Charles Bird, John Goddard and Joseph Lyon and their associates, are created a corporation by name designated, with the usual corporate powers, and the right to hold estate, limiting the lands as before stated as to quantity and location. The 2d and the 3d sections require that the coal lands, &c. necessary, or convenient for the company on the coal trade, which shall be on or before the 1st day of September, then next, (1826,) conveyed or caused to be conveyed in fee simple, to the said corporation, by the said Benjamin Kugler, Charles Bird, John Goddard and Joseph Lyon, and such persons as they shall associate with them, shall form a common stock and be divided into a convenient number of shares, and apportioned by the said corporation among the contributors, according to their respective interests, &c., and that before the said lands are put into the stock, so as to form any part of the said stock, the owner or owners of the land shall apply to the court of common pleas of Dauphin county, whose duty it shall be to appoint three disinterested freeholders, not residing within the county of Dauphin, who are to view and value the lands, &c., under oath or affirmation, and if approved of by the court, they are to be put into stock at such valuation, &c.; and the 4th section says that before the company shall claim the benefits and advantages of the said act, they shall appoint commissioners to receive subscriptions of stock, and upon the necessary quanity being subscribed, and the fact being duly certified to the governor, he was to issue his certificate of that fact under the state seal. The defendants contend that the plaintiffs should have shown a compliance with all these matters before they can recover in this suit.

So far as regards the existence of the corporation, it is to be presumed, unless it be put in issue by the pleadings, which has not been done here. And although the court is not entirely clear that the other matters mentioned in the 2d, 3d and 4th sections of the act, ought not to have been shown. Yet, to enable this cause to assume such a shape as with the least trouble and difficulty to decide all the essential matters in controversy between the parties, before a higher tribunal we charge you, that not having shown a performance of those matters by the company forms no obstacle to their recovery, if otherwise entitled, as all these things will be pre-

[Wolf v. Goddard.]

sumed to have been done where the defendant has not questioned them by his pleadings.

I have extracted a long portion from the opinion of the president of the common pleas, because my right hand was in such a situation that I could not write without pain: because it was so expressly admitted that the extracts from the deeds and synopsis of the law was correct, that counsel on both sides agreed on it without recurring to the deeds or acts of assembly, and because, although errors were alleged in one or two parts of it, yet the court were and are of opinion there is no error. Without denying the cases cited to prove that where a corporation sues in its corporate name for lands, or on a contract, (or admitting the universality of the rule,) that it must show its charter, the court was right in deciding that in this case it was not necessary to produce the charter. Here it did not sue in the corporate name. The title is vested in the five persons named, in trust for the Dauphin and Susquehanna Coal Company, &c., so much of the said thirty-nine tracts as the company may by its charter hold, and to convey such tracts or parts of tracts as may be selected before the 1st of March 1841—and as to such parts as are not selected, to hold them in trust for the trustees themselves in fee, in the proportions before mentioned; now it did not appear whether the Coal Company had selected the lands in question, perhaps that may depend on the issue of this suit. But the trustees have brought this ejectment, as they well might, in their own names, and have added in trust for the company. This does not vitiate—it does not injure defendants; nor, as it was, and is not settled whether the lands in question will belong to the five trustees, or the company, is there any thing amiss in the suit being brought as it is.

From the constitution of 1776 to this time, the property of religious societies is recognised; at first few of these were incorporated, and many are not at this day. Their places of worship and burial grounds, are held in the name of trustees for the use of each society; and suits have uniformly been brought in the names of the trustees, generally adding " for the use of the society." When the company shall have selected their lands, and received their conveyance they may find it necessary to sue in their own name.

This also renders it unnecessary to notice the question, whether the company have done all required by the act of assembly? The suit is not in the name of the company, and it must be remembered that if the company do not comply, or have complied with the requisitions of the law, the title is in, and is to remain in, the five trustees named in the deed.

Judgment affirmed.