THE METROPOLITAN BANK, Appellant, *v.* BENJAMIN GODFREY, and THOMAS W. WASON, Appellees.

### APPEAL FROM MADISON.

Where a party agrees to certain memoranda as the basis of a contract to be executed, which memoranda are not all included in a contract; which is unnecessarily extended and confused, and the party signing does so under a false impression, and under such circumstances as prevented his carefully examining and considering it; a court of equity will afford relief by reforming the contract.

The words "in specie," in a contract which includes realty as well as personalty, will be understood as referring to the latter.

Banks in New York, organized under the general law of that State, are corporations which can only use such functions as that law confers, and in the manner directed by it.

These corporations can only acquire and hold land, upon the conditions and terms, and in the way authorized by the law of their creation.

The recording acts of Illinois require that the record of a mortgage should disclose, with as much certainty as the nature of the case will admit, the real state of the incumbrance.

It is not good faith to take an absolute conveyance of land, where only a mortgage was intended.

Taking an absolute conveyance of land, and claiming a purchase, under what was only designed as a security, will, under most circumstances, be regarded as fraudulent, and will prevent the holder from claiming as a mortgagee.

A party will not be allowed to set up, that he holds lands, first, as a mortgage or a security, and then as his own property; fair dealing forbids this; nor is it fair dealing to sell lands which are held only as security.

Receiving a conveyance merely in payment of a pre-existing debt, is not sufficient, where there is a collision of *bona fide* claims. There should be a new consideration.

If a party is in possession of lands, by himself or tenants, and pays taxes on unimproved lands, it is sufficient to put those who deal with such lands, upon inquiry, as to ownership.

The Metropolitan Bank, being organized under the general banking law of New York, cannot take and hold lands in its corporate name.

THIS was a suit in chancery, originally brought in the court below, by Thomas W. Wason, against Benjamin Godfrey, Rebecca E. Godfrey, Henry Dwight, Jr., Charles S. Olden, and the Metropolitan Bank.

The original bill filed by Wason, sets forth that the said Godfrey and one A. T. Cowman, who were partners under the firm of A. T. Cowman & Co., in the construction of the Alton and Sangamon Railroad, purchased of the said Wason and one Charles Wason, his partner, certain passenger, baggage, freight and gravel cars, for the sum of $26,650.

That, on the 7th day of May, 1851, he and his said partner settled with the said Cowman and Godfrey, and the said Cowman and Godfrey were found, on such settlement, to be indebted to the said Thomas W. and Charles Wason, in the sum of $19,066.45; that the firm of Thomas W. Wason and Charles Wason was dissolved, and the said Thomas W. Wason became the assignee of all the property and assets of said firm; that the said Cowman and Godfrey executed and delivered to said Thomas W. Wason three promissory notes for the above balance due on settlement.

That, on the 26th day of September, 1851, the firm of A. T. Cowman & Co. was dissolved, and the said Godfrey succeeded to all the rights and obligations of said firm; that, in January, 1853, the said complainant recovered judgments against said Godfrey, on the said promissory notes, before the United States Circuit Court for the District of Illinois, upon which executions were issued, but never levied, for the reason no property could be found whereon to levy the same, and the said executions remain wholly unsatisfied; that the said judgments became a lien upon all the estate, legal and equitable, in land which the said Godfrey then owned in the district of Illinois.

That, on the 3rd day of October, 1851, the said Godfrey, being seized in fee, conveyed unto Henry Dwight, Jr., by quit-claim deed in fee, for the recited consideration of $100,000, certain lands; which said deed was duly recorded in the recorder's office of Madison county.

That, on the same 3rd day of October, 1851, said Godfrey

executed to Henry Dwight, Jr., a bill of sale of certain personal property.

That, at the same time, the said Dwight executed, to the said Godfrey, the instrument in writing described in the opinion.

That, on the 21st day of November, 1851, in pursuance of a secret understanding between said Godfrey and said Dwight, said Dwight conveyed to said Charles S. Olden, of New Jersey, certain lots in Alton, in trust for the wife of said Godfrey.

That, on the 27th day of March, 1852, the said Godfrey executed, to the said Dwight, a chattel mortgage on his personal property, purporting to secure the sum of $114,446, recited to be due from said Godfrey to said Dwight.

That, on the 29th day of March, 1855, the said Godfrey executed, to the said Dwight, another chattel mortgage, purporting to secure the sum of $6,054, recited to be due from said Godfrey to said Dwight.

The bill charges, that the first of said chattel mortgages was due and payable, by its terms, one year from its date, which period has elapsed, and that said Dwight has permitted said Godfrey to remain in possession and use of said property ever since, and charges that the second of said chattel mortgages was made without consideration, and for the purpose of covering up said Godfrey's property. The bill further charges, that the said deed, bill of sale, and the chattel mortgages by the said Godfrey to the said Dwight, were made and contrived for the fraudulent purpose of hindering and defrauding the complainant in the collection of said debt, and for the further purpose of covering up said property, so that the same could not be reached by legal process, and states divers badges of fraud in said transactions.

The bill further charges, that whether the said transaction amounts to a fraud or not, said deed, bill of sale and mortgages were, in equity, mere securities in the hands of Dwight for debts due him by Godfrey, at the time of the execution of said instruments, and such advances as Dwight might thereafter make to Godfrey, in pursuance of the written instrument made by Dwight to Godfrey, bearing even date with the said quit-claim deed, and that Dwight, and all persons claiming under him with notice, can only hold the property as a security for such balance, if any, which may be found to be due by Godfrey to Dwight, upon a settlement between them.

The bill further charges, that the debts mentioned in the written instrument executed by Dwight to Godfrey, and all advances under the same, have been fully paid by Godfrey to Dwight, and that in equity Godfrey is entitled to a re-conveyance of the property from Dwight.

The bill further charges, that Godfrey and Dwight were co-partners in the construction of said railroad; that Dwight was the trustee for Godfrey, and that Dwight ought to be made liable for any losses, if any, in the management and disposition of said property.

The bill further charges, that on the 29th day of October, 1853, Dwight conveyed, by quit-claim deed, to Edward Keating, all his interest in the property described in the deed of October 3rd, 1851, executed by Godfrey to Dwight, except certain property conveyed by Dwight to Olden, in trust for Mrs. Godfrey; that at the time of said conveyance to Keating, Godfrey was in possession of said lands under the instrument of October 3rd, 1851, and that Keating had notice of the equities of the complainant and of the transactions between Godfrey and Dwight, and that said conveyance was made without any consideration whatever.

The bill further charges, that on the 9th of January, 1854, and on the 27th of February, 1854, Keating, at the request of Dwight, conveyed all his interest in said lands to the Metropolitan Bank, city of New York, and on the 14th day of January, A. D. 1854, Dwight, by warranty deed, conveyed the same lands to the said Metropolitan Bank, for the pretended consideration of $95,000. The bill charges, that the said bank had no right or authority to take or hold said lands, and that no title vested in the bank under said conveyances; and charges that Godfrey was still in possession of the lands at the time of said conveyances, and that the bank took said lands subject to the equities of the complainant.

The bill further charges, that at the time of the conveyance by Dwight to Keating, Dwight was utterly insolvent, and that said conveyance was made by Dwight for the express purpose of preventing the creditors of Dwight from reaching said property by legal process.

The bill prays that the said deed, bill of sale, and chattel mortgages, may be declared fraudulent and void as to the complainant; that an account may be taken of the amount due upon his said judgments, and that said lands, or so much thereof as may be necessary, may be decreed to be sold in satisfaction of said judgments, etc., etc. And prayer for general relief.

Dwight answers, that he knows nothing of the contract between complainant and Charles Wason, and the firm of A. T. Cowman & Co., for the delivery of cars, nor of the dissolution of partnership between the complainant and Charles Wason; nor of the execution of the three notes to the said complainant by A. T. Cowman & Co.; knows nothing of the recovery of the judgments against Godfrey, by the complainant, as alleged in

the bill; or of the issuing of executions thereon; or the lien or effect of said executions; but requires strict proof.

Admits the dissolution of the firm of A. T. Cowman & Co., and that Benjamin Godfrey succeeded to all the rights of said firm, as also that the Alton and Sangamon Railroad was completed and put in running order; but does not know that the said cars mentioned in complainant's bill were ever delivered or used as alleged.

Admits the execution of the deed to him by Godfrey on the 3rd day of October, 1851; also the execution of the bill of sale to him by Godfrey of personal property, of October 3rd, 1851; also the execution of the instrument of writing, of same date, by him to Godfrey. Admits the execution of the two chattel mortgages, mentioned in said bill, by Godfrey to him, but avers that both of said mortgages were made for a good and valuable consideration, and that Godfrey was at the time indebted to him to the amounts therein stated. Admits that Godfrey is in possession of the property named in the last mortgage, and insists that he has the right to allow him to remain in such possession, and denies that complainant has been injured thereby. Denies that the deed and bill of sale of October 3rd, 1851, and the chattel mortgages named in the complainant's bill, were made without consideration, or to defraud or hinder any one, but on the contrary, were made and entered into in good faith, and for a good and valuable consideration. Denies the existence of all facts constituting any fraud or badge of fraud. Denies that he is indebted to Godfrey; and also denies that the debts named in the contract of October 3rd, A. D. 1851, have been paid by Godfrey, or from his means, and says that there is due to him, (Dwight,) after disposing and using all the property named in the deeds, the sum of over $250,000. Admits the transfer of lands to Keating, as mentioned in the bill; admits that Godfrey was in possession of a part of them, but only the improved part; admits that Keating paid no consideration, and transferred them at respondent's request to the Metropolitan Bank, but denies any fraud or intention of fraud, as also that he was insolvent at the time of the transfer. States that Keating held said lands only as trustee, and that the transfer made to the Metropolitan Bank was in consideration of a debt of over $100,000 due from this respondent to said bank. Denies that he ever assumed or promised to pay the complainant the said claims of complainant, mentioned in the bill.

Keating disclaims all interest in the property mentioned in the bill of complainant, both real or personal, and disclaims all interest in the decree prayed for by the complainant.

Olden states that he has no personal knowledge of the trans-

actions detailed in the complainant's bill. That the deed from Henry Dwight, Jr., and wife, to him, in trust for Mrs. Godfrey, was executed without his knowledge, but that after he was informed of its execution, he accepted of the trust as an act of kindness to Mrs. Godfrey; has no interest in the matter except to defend her, and believes the deed was made in good faith. He states, that on the first day of April, 1855, the said Godfrey and wife executed to him a mortgage upon a portion of the lands in complainant's bill mentioned, to secure the sum of $5,000, which the said Godfrey owed him; that said mortgage still remains unsatisfied; and prays that his rights in the premises, as well as those of Mrs. Godfrey, may be protected.

Godfrey and wife, by their answer, admit the partnership of Cowman and Godfrey, as stated in bill; that the said firm purchased the cars, and that a balance was found to be due, as alleged in the bill; have no knowledge of dissolution of copartnership of complainant and Charles Wason, but admit the execution of promissory notes, as alleged in the bill; admit the dissolution of the firm of A. T. Cowman & Co., and that suits were instituted on said promissory notes, but whether judgments were obtained and executions were issued, and lost, as alleged, they do not know. Admit that Godfrey, on the 3rd of October, 1851, was seized of the lands described in the deed made by him to Dwight, but they allege that there were various incumbrances existing upon the said lands, by mortgages for moneys due by Godfrey. They admit the execution of the bill of sale of personal property, by Godfrey to Dwight, on the 3rd of October, 1851, and of an instrument of writing, on the same day, by Dwight to Godfrey, as set forth in said bill. They admit the execution, by Henry Dwight, Jr., of a deed to Charles S. Olden, in trust for Rebecca Godfrey, as set forth in the bill, but they aver that the consideration of the deed, was the relinquishment, by the said Rebecca, of her right of dower in the lands which had previously been conveyed by Godfrey to Dwight, and that the same was a fair and *bona fide* transaction. They admit the execution and delivery of the chattel mortgages, by Godfrey to Dwight, as set forth in the bill, and that Godfrey has remained and still is in possession of the property therein described, rendering an account for the same, but they deny that said chattel mortgages were executed without consideration, or to defraud creditors, or for the purpose of hindering the complainant in the collection of his debts, or for the purpose of covering up said property so that the same could not be reached by legal process, but, on the contrary, they allege that the same were executed by Godfrey, and for the considerations therein stated. Respondents have no knowledge, except by hearsay, of the execution of

the several deeds from Dwight to Keating, and from Dwight and Keating to the Metropolitan Bank. They admit that Godfrey has been, since 1851, and still is, in possession of the lands embraced in said deeds, but they do not know whether Dwight was insolvent at the time of his conveyance to Keating, nor do they know whether he ever promised to pay the claim of complainant against Godfrey.

The Metropolitan Bank denies all knowledge or information of any and all transactions between complainant and Godfrey and Cowman, and of the recovery of the judgments against Godfrey ; denies all knowledge of the bill of sale of personal property, and of the chattel mortgages made by Godfrey to Dwight, and of the deed made by Dwight to Charles S. Olden, for the use of Rebecca Godfrey, and of the instrument of writing executed by Dwight to Godfrey, on the 3rd of October, 1851; and generally denies all knowledge of every and all transactions had between Godfrey and Dwight, as set forth in complainant's bill. Admits that Godfrey was seized of the lands mentioned, and that he conveyed the same to Dwight, as set forth, and that Dwight conveyed the same to Keating, without any consideration, but whether said Keating had, at the time of said conveyance, any notice of any equities existing in favor of complainant, respondent is wholly ignorant. Admits that Dwight and Keating conveyed the said lots and lands, as mentioned in said bill, to the bank, for the consideration mentioned in the deed from Dwight to the bank, and avers that it had good right and authority to hold the same under said deeds. Denies that at the time of the execution and delivery of said deeds, by Keating and Dwight, respondent knew that Godfrey was in possession of said lands and lots, under the agreement of October 3rd, 1851, and that the judgments of said complainant were a lien upon said lands, and that this respondent had notice of the nature of the transactions between Godfrey and Dwight, but on the contrary, the bank avers that it was entirely ignorant of the same. Avers the fact to be, that Dwight was indebted to the bank for upwards of $100,000, and that the bank caused an attachment to be sued out of the Circuit Court of Madison county, and levied upon the said lands and lots, but that afterwards, Dwight conveyed the said lands to this respondent, and procured Keating to make a conveyance of the same, in payment and satisfaction of this respondent's claim, and thereupon respondent dismissed the said attachment. Avers that it purchased the said property from Dwight, for a full and valuable consideration, without any notice whatever of any equities existing against the same, in favor of said complainant, and

that it is a purchaser, for a full consideration, without notice of any equities.

To which several answers, the complainant filed replications.

Benjamin Godfrey, one of the defendants in the original bill, filed a cross-bill, July 2nd, 1856 ; and after setting forth the material averments contained in the original bill, alleges that at the time the deed was made by him to Henry Dwight, of October 3rd, 1851, there were various subsisting mortgage liens upon parts of said lands. He further states, that the deed, bill of sale and chattel mortgages, made by him to said Dwight, were in good faith and for valuable consideration : the bill of sale and mortgages, to secure the payment of the sums therein specified ; and the *deed*, to secure the payment of moneys for which Godfrey was liable, and for future advances to be made by Dwight, and for the considerations specified in the contracts made by Dwight with Godfrey, of date October 3rd, 1851.

That Dwight had failed to render any account to Godfrey, although often requested so to do ; but claimed that there was due him $250,000, after disposing of and using all the property named in said deed. Charges that Dwight received from Godfrey, in personal property and choses in action, $1,449,279.18, and including the lands, $1,774,279.18. Further charges that Dwight received from the Alton and Sangamon Railroad Company, after the completion of said road, $640,328.08, or more, as compensation for advances, extra labor, etc., on account of the construction of said road, which in equity belongs to Godfrey, and which said sum was a full and complete indemnity to Dwight, for the building of the railroad, after deducting the sum of $469,287.36.

Cross-bill further alleges that Godfrey, at the time he executed deed and bill of sale to Dwight, (October 3rd, 1851,) was in the custody of an officer in the city of New York, arrested for a debt due by A. T. Cowman &.Co., and that it was necessary for him, in order to obtain his release and personal liberty, to sign the deed and bill of sale to Dwight, as also to procure from Dwight his contract of the same date. That the contract signed by Dwight, was not read by him, Godfrey, at the time, or before the same was executed, and that he was not allowed time, by the agents of Dwight, to read or examine said contract ; that it was represented, by the agents of Dwight, to be drawn according to the outline or basis furnished for the drawing of said contract, which basis had been examined and assented to by Godfrey, which basis is set out in the opinion.

That Godfrey never would have executed, and never did consent to have said contract varied in any essential particular from the said basis or outline ; but that the same differs in this: by

said basis, in case there were any profits arising from the construction of said road, Dwight was to re-deed to Godfrey his individual property; while by the contract as written, Dwight is to have seventy-five per cent. of the value of said property if the same should be re-deeded, and is only to re-deed to Godfrey twenty-five per cent. of said property. Charges that Dwight failed to comply with his contract; did not provide money as it was needed for the construction of the road, by means whereof Godfrey was subjected to delay, loss and expense. That Dwight threw obstacles in the way of the construction of said road by taking hands from and neglecting the same, and engaging in the extension of said road between Springfield and Bloomington, before the completion of his contract with Godfrey. That Dwight disregarded his contract, by failing to account, and failing to re-deed the lands to Godfrey. That Dwight received effects more than sufficient to pay all liabilities incurred for the construction of the said road; and that Dwight and his assigns, with notice of the equities, ought long since to have re-conveyed the said lands to Godfrey. Oath of defendants waived.

Prayer, that on final hearing, the court will take an account between Dwight and Godfrey; that a balance may be struck; that Dwight and his assigns may be required to re-convey all of the real estate to Godfrey which was conveyed by Godfrey to Dwight, clear of all liens, charges and incumbrances, as also to transfer to him all the choses in action, railroad bonds, etc., which have not been disposed of by Dwight for the benefit of Godfrey. And for general relief.

Thomas W. Wason answers to cross-bill, that he has no knowledge of incumbrances on the lands at the date of the deed from Godfrey to Dwight, (Oct. 3, 1851.) Denies that the deeds, mortgages and bills of sale made by Godfrey to Dwight were *bona fide*, and upon the consideration set forth in the cross-bill. Admits all the other allegations in the bill to be true.

Henry Dwight answers, that he has no knowledge of incumbrances on the lands at the date of deed from Godfrey and wife to him. Admits that the deed and mortgage were *bona fide*, and for a good consideration. Denies that he ever refused to render an account to Godfrey. States that in a conversation had with Godfrey after the completion of the Alton and Sangamon Railroad, it was admitted by Godfrey that it would be wholly unnecessary to make up a detailed account, as the cost of the road had far exceeded the value of all assets placed in his, Dwight's, hands. He denies that Exhibit D, made part of Godfrey's bill, is a true account against him, and files with this

his answer, Exhibit F, which shows the amount due him by Godfrey. He denies generally the charges in the cross-bill.

The answer of Metropolitan Bank to cross-bill, admits the filing of the bill of Wason, and the answers and replications thereto, and that the contents of said bill are substantially set forth in cross-bill; denies that Wason has any equities as against it, and refers to its answer to original bill, and avers the same to be true. Has no knowledge of incumbrances existing upon the lands deeded by Godfrey to Dwight prior to the date of said deed. Admits that the deed of Godfrey to Dwight was *bona fide* and for a good and valuable consideration, and that the mortgages were *bona fide* and for good and valuable consideration. Denies that the real estate conveyed by Godfrey to Dwight was worth $325,000; avers that it was not worth more than the sum paid by it to Dwight, as set forth in answer to bill of Wason. Denies that Godfrey was in possession of all the real estate conveyed to it by Dwight, at the date of the conveyance; but that he was in possession of only a small portion of the same as a tenant at sufferance of Dwight, and did not claim to have any interest, either at law or equity, in any part of said lands. Denies all knowledge of the transactions between Godfrey and Dwight; avers that it purchased the lands from Dwight for a full and valuable consideration, without any notice or knowledge of any equities of Godfrey; that it had good right and lawful authority to hold the same, as set forth in its answer to the bill of Wason, which said answer it again avers to be true, and refers to the same as containing a full and particular statement of the consideration paid Dwight for said lands.

Godfrey filed an amendment to his cross-bill, averring that the said supposed conveyance of Dwight to the Metropolitan Bank, if operative at all to pass title, was made for the better securing certain sums of money due from Dwight to the bank; and that the conveyance was subject to either a written or parol condition, that upon the payment by Dwight to the bank, the said lands were to be re-conveyed by the bank to Dwight or his assigns; and the prayer of the bill was amended by praying that the bank be required to answer, whether the deeds from Dwight and Keating to the bank were not made with the express or implied understanding, that upon the payment by Dwight to the bank, the lands were to be re-conveyed to Dwight or his assigns; and that the bank may be required to set forth the amount of Dwight's indebtedness at the date of the conveyance; the amount of the securities held by the bank belonging to Dwight, for securing the debt due by Dwight; and also all correspondence and agreements between Dwight and the bank, relating to his indebtedness, the securities and the conveyance

of the lands. And that the bank be required to first dispose of and apply all the other securities held by it to the liquidating of said indebtedness, before it shall be permitted to sell any part of the lands. And that Godfrey may have the right to pay off the debt due to the bank by Dwight and have an assignment and transfer of all said securities and lands.

Answer of the bank to this amendment is, that for the consideration of the conveyance by Dwight, and the purposes for which it was made, the amount due by Dwight at the date of the conveyance, the amount of securities held by it, and of what they consisted, and as to all agreements and understandings, between the bank and Dwight, reference is had to the deposition of Henry Meigs, Jr., which is made the answer of the bank.

Deposition of *Henry Meigs, Jr.*, (taken by complainant Wason.) Witness says that he is cashier of the Metropolitan Bank; that said bank was incorporated under the general banking law of the State of New York, on the 7th of April, 1851; the articles of association are dated the 7th of April, 1851. Henry Dwight, Jr., was indebted to the Metropolitan Bank on the 1st day of January, 1854, and from that time to the 1st of April, 1854, in the amount stated in Schedule B, annexed to the deposition of witness, and that said indebtedness was contracted at the times and in the amounts as stated in the said schedule; an account is also annexed to the said deposition of witness, of the securities received by the bank, for said indebtedness, and is marked Schedule C; also copies of the notes of said Dwight, representing his indebtedness to the bank, marked Schedule D. Witness states that the bank still holds the notes of said Dwight, mentioned in Schedule D, and also the securities mentioned in Schedule C, except that some portions of the Alton bonds have been paid and credited; that twenty Michigan Southern Railroad bonds, of one thousand dollars each, and four Cleveland and Pittsburgh Railroad bonds, of one thousand dollars each, were given up to said Dwight on the 29th of June, 1853, in exchange for twenty-five of the Chicago and Mississippi Railroad bonds, of one thousand dollars each; that the three hundred shares of the Bank of Owego have been sold, and the proceeds credited on the account; that the note of DeWitt, treasurer, for the sum of $7,498.57, has been paid, and the proceeds credited on the account; and that thirty-three Michigan Southern Railroad bonds, of one thousand dollars each, were given up to said Dwight, in consideration of his giving deeds for lands in Illinois and elsewhere. States that said bank now holds, as security for the indebtedness of said Dwight, eleven hundred shares of the stock of the Chicago and

Mississippi Railroad Company, one hundred and one second-mortgage bonds of said railroad company, of one thousand dollars each, and fifty-seven thousand dollars of six per cent. bonds of the city of Alton; said bank also holds deeds for sundry lands in Illinois and elsewhere, received in exchange for thirty-three thousand dollars of Michigan Southern Railroad bonds. Witness states, that on the 30th of December, 1853, the board of directors of the bank passed the following resolution: "Resolved, to give up to H. Dwight, Jr., thirty-three bonds of the Michigan Southern Railroad Company, of one thousand dollars each, on condition that he gives a full and satisfactory title to all the lands in Illinois attached by the bank." In obedience to this resolution, said bonds were given up to said Dwight, and he conveyed said lands to said bank by warranty deed. A proposition in regard to said lands was made by said Dwight, on the 19th of December, 1855, to which the bank replied on the 2nd of January, 1856, a copy of which correspondence is annexed to this deposition, marked Schedule E.

Deposition of *J. W. Zacharie*, (taken by complainant Wason.) Witness states, that he was in the city of New York in the months of August, September and October, 1851, when the agreement between Captain Godfrey and Henry Dwight, Jr., in relation to the construction of the Alton and Sangamon Railroad, was made. States, in substance, that the said contract was not made in accordance with the basis and memorandum agreed upon between said Godrey and Dwight; that the paper marked Exhibit C, is the memorandum or basis of the contract between said Godfrey and Dwight, but Dwight's lawyer, who drew up the contract, changed the same from the basis agreed upon between the parties, and refused to allow Godfrey time to examine said contract, assuring him that it was all right; and that said Dwight also assured said Godfrey that the contract as written was all right, and should anything prove wrong, he would make it right, upon which said Godfrey was induced to sign said contract. The witness believes said Godfrey was duped into signing said document; witness states that said Dwight dictated to Edward Keating the basis of conditions under which he would undertake to build the road; that said conditions were accepted by Godfrey, and said Dwight was to have the contract drawn up in form by his attorney, and that the paper marked Exhibit E is positively the memorandum of said basis as written down by said Keating, in the presence of witness. Witness, after answering various interrogatories in regard to the value of the bonds of the Alton and Sangamon Railroad Company, and the price of railroad iron, etc., states, in answer to the last general interrogatory, that from all the

facts, circumstances and conversations in the case, within his knowledge, he is confident that Mr. Keating was acting for the interest of Dwight in the whole matter of the contract, and that he, Keating, and E. Fitch Smith, prepared the contract for the purpose of using Godfrey, if it possibly could be done.

The decree recites that Wason is equitably entitled to have his judgments satisfied out of the real estate conveyed by Godfrey to Dwight by deed, of date October 3rd, 1851; that Godfrey pay to Wason $28,770.41, with interest from date of decree, within ninety days from the 29th of October, 1859 ; in default thereof, that the master in chancery sell so much of said real estate as will be sufficient to satisfy the same. That Godfrey recover from Dwight one hundred thousand two hundred and eighty-two dollars and ninety-five cents. It was further decreed that the conveyance by Dwight to the Metropolitan Bank, of the lands conveyed by Godfrey to Dwight, October 3rd, 1851, was fraudulent and void as to Wason and Godfrey. That Godfrey was entitled to a re-conveyance, and the master of the court was directed within sixty days from the date of the decree, to execute and deliver to Godfrey a deed conveying to him or his assigns all the right, title and interest of Henry Dwight and the Metropolitan Bank, and of all persons claiming by, through or under them or either of them, in and to all the lands and real estate described in the said deed of October 3rd, 1851, from Godfrey to Dwight, excepting the lots conveyed to Olden for the use of Mrs. Godfrey ; and enjoining Dwight and the bank from hereafter conveying, setting up any title or claim to, or further prosecuting any suit for the recovery of said premises or any part thereof. · Decree for costs against Dwight and the Metropolitan Bank. Whereupon the bank prayed an appeal to the Supreme Court, which was granted. By agreement, cause to be heard at Springfield.

It was further agreed, by counsel, in regard to the record before this court, that in the cases of *Wason* v. *Dwight and others*, and of *Godfrey* v. *Wason, Dwight, Metropolitan Bank and others*, on cross-bill, in which decrees were rendered at the October term, 1859, of the Circuit Court of Madison county, Illinois, from which an appeal has been prayed by the said Metropolitan Bank to the Supreme Court of said State, which by agreement is to be heard at Springfield, Illinois :

It is agreed as follows, and admitted to be true, that said Wason on his part produced in court, on the hearing of said cause, properly certified copies of two several judgments of the Circuit Court of the United States for the district of Illinois, in favor of said Wason, one against Benjamin Godfrey, and the other against said Godfrey, impleaded with Augustus T. Cow-

man, at the terms, and for the amounts, and to the effect, set forth in the master's report made in this case. It is further agreed, that the notes upon which said judgments were obtained, were given by said Godfrey and Cowman to said Wason, for the purchase of cars and rolling stock which were used upon said Alton and Sangamon Railroad and its extension and connections as long as they lasted, or, if not worn out, are in use upon said road.

It is further agreed, that the deed from said Dwight to Keating, referred to in the pleadings in these cases, was made at the time alleged in the original and cross bills ; and also that the deeds from said Keating and wife to the said " Metropolitan Bank," were made by the said Keating and wife to the said Metropolitan Bank in its corporate name and description of the " Metropolitan Bank," in the city of New York, as party of the second part, and not in any other name or manner, and that said deeds were dated at the times set forth in said original and cross bills, and they purported to be quit-claim deeds.

That the deed from said Dwight and wife to said bank was made to said bank in the corporate name of the " Metropolitan Bank" in the city of New York, as party of the second part, and in no other name or manner ; and that it was made at the time stated in said original and cross bills, and that the lands and lots described in said deeds from said Keating and Dwight to the said " Metropolitan Bank," are the same lands and lots as are specified and described in said deed from said Godfrey to said Dwight, and in the final decree in these cases, except the Franklin House property.

It is further agreed, that the master's report in these cases, in respect to the state of the accounts between said Godfrey and Dwight is correct, and the appellant agrees not to assign for error any exception to the said master's report and decree thereon, except in so far as it decides that a re-conveyance of said lands and lots in dispute should be made to said Godfrey.

And it is further agreed, that the portions of the pleadings, exhibits and proofs contained in the proceedings in these cases in the court below, which are omitted in the abridgment thereof prepared for the Supreme Court, are not essential to a determination of said cases, and said abridgment shall be taken to be a full and perfect record upon the hearing of said cases on the said appeal ; but nevertheless, it is expressly agreed, that if either party shall hereafter discover that any essential part or portion of the record or proceedings, or proofs below, has been omitted by *oversight or accident*, it may be supplied from the originals, proceedings and record, provided no continuance is to be wrought thereby.

J. & D. GILLESPIE, *Solicitors for Wason.*
TRUMBULL & SAWYER, *Solicitors for Godfrey.*
DAVIS & BILLINGS, *Solicitors for the Metropolitan Bank.*
H. W. BILLINGS, *Solicitor for Dwight.*

It is further agreed, that the Metropolitan Bank, after the conveyance to the bank by Dwight, paid taxes on the lands conveyed, amounting to the sum of five thousand five hundred and seventy-five dollars and sixty-four cents.

Dec. 23, 1859.                              (Signed), *by Counsel.*

WM. TRACY, with BILLINGS & DAVIS, for Appellant.

L. TRUMBULL, with W. H. UNDERWOOD and S. T. SAWYER, for Godfrey.

J. AND D. GILLESPIE, for Wason.

H. W. BILLINGS, for Dwight.

BREESE, J.  We think a fair construction of the contract, signed by Henry Dwight, Jr., dated October 3, 1851, reciting the conveyance of land by B. Godfrey to him, and certain bonds and stocks and personal property at the same date, entitles Godfrey to a re-conveyance of the land, and that they were conveyed to Dwight as security only, with the right to dispose of them, should it become necessary to do so, to raise means to complete the railroad.

The proofs abundantly show that they were not used, or needed for such purpose, but that, with the bonds, stocks, and other effects conveyed by Godfrey, Dwight was enabled to complete the road, and make a clear profit of three hundred and eighty three thousand, eight hundred and six dollars, and seventy-seven cents.

The road was completed and delivered up by Godfrey, the contractor, in September, 1852.  By the terms of the contract, on the execution of the deed by Godfrey, and the surrender to Dwight of a large amount of stocks and bonds, and mortgaging valuable personal effects, Dwight agreed to act as Godfrey's financial agent in procuring funds necessary to complete the road, as they were needed.

Nothing is shown in the record how much of the road was completed when this contract was made, but about six hundred thousand ($594,567) dollars had been expended by Godfrey upon it up to that date.  As the contract was taken by Godfrey and Cowman at about nine hundred and fifty thousand dollars, it is fair to presume that near two-thirds of the road had been completed, and that a sum not much exceeding three hundred thousand dollars, would be required to finish it.  To provide this amount, or such other amount as might be necessary to complete it, Godfrey transferred to Dwight the benefit of his contract

with the railroad company, assigned to him by Cowman, together with all the personal property, bonds and stocks to which he was entitled, as such assignee, and which were in value, as estimated, about one million, six hundred and seventy thousand dollars.

There is no complaint by Dwight, that there was any loss, by depreciation or otherwise, on any of these bonds, stocks, or effects, and it is in proof that he completed the road with them, and had the profit of near four hundred thousand dollars, as above stated.

At the same date, to make Dwight perfectly secure, beyond any possible contingency, Godfrey conveyed to him all his real estate in this State, and elsewhere, estimated by Dwight himself at one hundred thousand dollars, and so expressed as the consideration in the deed, but which are proved to have been worth, when conveyed, three hundred and twenty-five thousand dollars, and, at the hearing, about four hundred thousand dollars.

The controversy arises about these lands. We think these lands, not having been used in the building of the road, or needed for such purpose, should be re-conveyed to Godfrey, for several reasons.

In treating of the property conveyed by Godfrey to Dwight, in the contract of October 3rd, 1851, Dwight agreed to keep an account of the amount he should receive on the sale and disposition of the property transferred to him, whether absolutely, or collateral; and upon the completion of the road, he, Dwight, would assume, and pay an amount equal to the amount received for the property he might sell and dispose of in a certain manner, as thus: The contract, having recited that Cowman & Co. had procured Dwight to negotiate a loan for them, of $170,000, and had guaranteed the payment of the loan, or assumed other liabilities in reference to it, which would render him responsible—and also assumed a debt due by Cowman & Co. to J. W. Zacharie, of New Orleans, of $90,000—he, Dwight, agreed to refund and pay this $170,000 to Cowman & Co., and also the said sum of $90,000 to J. W. Zacharie, and all the costs and expenses attending the completion of the road, and the fulfillment of Godfrey's contract with the railroad company, and all the costs, expenses, and counsel fees, Godfrey was, or might be subjected to, or has paid, or assumed to pay, in reference to the transaction, or to the property, or in reference to the railroad, or in reference to any matter or thing connected with, or relating to, his financial agency, and all other obligations and liabilities which Godfrey had assumed, or paid, or incurred, in any way relating to such agency, or in reference to the property and effects transferred to him, or for any liens, incumbrances, charges, taxes and assess-

ments thereon, and also all loans he should procure or negotiate for Godfrey; and he further agrees, if all these undertakings and payments shall not equal the amount he shall receive for the property transferred, he then agrees to pay such balance as may be due by Cowman & Co. to M. Morgan, of New York City, and the Canal Bank of New Orleans, $64,287.36, and the amount of duties on certain iron and spikes, amounting to $12,438.

Dwight further agreed as follows:

1. The said party of the first part further agrees, to and with the said party of the second part, his legal representatives and assigns, that if the aggregate of the amount which said party of the first part shall receive in money, on the sale and disposition of said property thus transferred to him, whether absolutely, or as a collateral, shall exceed the amount that said party of the first part shall have to pay under this agreement, as hereinabove provided for, that the said party of the first part shall, upon the full and final completion of said railroad, pay to said party of the second part, his legal representatives or assigns, an amount in money, which shall be equal in amount to twenty-five per cent. of such excess of receipts, after deducting the amount paid as hereinbefore provided for.

2. It is further agreed, by and between the parties hereto, that said party of the first part shall be allowed and paid, out of the receipts of said property, as a compensation for his services, as such financial agent for said B. Godfrey, an amount which shall be equal to seventy-five per cent. of the aggregate amount of such receipts, by said party of the first part, on the sale of said property, after paying the said sums above provided to be paid to persons other than said B. Godfrey; and also to the amount equal to seventy-five per cent. of the actual value of such parts of said property and effects which may not then have been transferred, sold, or otherwise disposed of by said party of the first part, (to pay said sums.)

3. If, upon the final completion of said railroad, any part of said property and effects thus transferred to said party of the first part, shall remain in hand, in specie, not sold or converted into money, and said party of the first part shall have realized out of the sale of a portion of said property, an amount equal in amount to the sums hereinbefore provided to be paid, then said party of the first part agrees, that he will transfer unto said party of the second part, his representatives and assigns, such portion thereof as shall be equal in value to twenty-five per cent. of the actual value of said property, as then remains in his hands in specie, unconverted or undisposed of.

That said party of the first part shall be permitted to retain

the remaining seventy-five per cent. of the value of such property then remaining in his hands, in specie, as part of his compensation for such services as such financial agent, as herein provided. The said party of the second part shall not be entitled to the payment to him, or to said transfer to him, until said party of the first part shall have received and realized out of said property so transferred, a sum equal to the amount provided to be paid, as hereinabove provided to be paid to parties, other than said party of the second part.

The generic term property, as here used, may include lands; and if the land had been sold or disposed of in the construction of the road, and there should have been an excess, over and above the amounts Dwight was bound to pay, he was then obliged, on the completion of the road, to pay to Godfrey, his legal representatives or assigns, an amount in money, which shall be equal in amount to twenty-five per cent. of such excess of receipts, after making the deductions for payments as provided for above.

The difficulty arises out of the clauses we have marked 2, 3. The lands were not sold for the purpose; other funds, more than sufficient for the purpose, were supplied by these stocks, bonds, etc., transferred by Godfrey. The phraseology of these clauses is not such as is usually employed when treating of real estate.

But let us analyze these clauses, for neither they, nor any part of the contract, are framed with that clearness and simplicity they might have been, and are obnoxious to much of the complaint of the witness, Zacharie, when speaking of the terms of the contract, and its unnecessary verbosity. Dwight was to be paid for his services as financial agent; he was to be paid out of the receipts of the property; he was to be paid an amount which should be equal to seventy-five per cent. of the aggregate amount of such receipts; he was to receive that compensation on the sale of the property, after paying the sums provided to be paid by him, to persons other than Godfrey. These, evidently, contemplate a sale of the property; a conversion into money.

It then provides, he shall be paid, also, to the amount of seventy-five per cent. of the actual value of such parts of said property and effects, which may not have been transferred, sold, or otherwise disposed of by him. For what purpose? Why, to pay the sums he had contracted to pay while the road is in progress. In other words, if, during the progress of the work, he shall find it necessary to sell any of this property, he shall be allowed seventy-five per cent. of the aggregate amount of the receipts, as compensation for his agency, out of the property and effects which may not then have been sold, (when?) " also

to the amount equal to seventy-five per cent. of the actual value of said property and effects."

This is wholly unintelligible, and is not the way a business man would frame a fair contract, which he intended should be understood. To what does " these " refer ? What does this part of clause two, mean ? We cannot say, unless it be taken and construed in connection with clause three. Taken in connection with that, it can have no reference to the lands, but to the stocks, bonds, and other personal property.

If, on the completion of the road, any part of the property and effects thus transferred shall remain in hand, in specie, not sold, or converted into money, clearly means to include the personal property only ; for land unsold is never spoken of, or alluded to as remaining on hand, in specie.

And again, in the last member of this clause, Godfrey is to have twenty-five per cent. of the value of this property and effects which may remain on hand, *in specie,* unconverted or undisposed of, and Dwight to retain the remaining seventy-five per cent. of the assets then remaining in his hands, in specie, as part of his compensation as financial agent ; but Godfrey is not to be entitled to this, or to the transfer, until Dwight shall have received and realized, out of the property transferred, a sum equal to the amount provided to be paid as hereinabove provided to be paid to parties other than Godfrey.

What could have been the use in so framing a contract, which need not, to have been understood, filled more than one page of legal cap paper ?

Well might Godfrey complain that he did not understand it ; that he wanted time to examine it ; to submit it to friends. Godfrey never read the contract. It was read by the scrivener, and we are not at all surprised Godfrey did not understand it when read. We think this part of the contract fairly construed, as verbose as it is, has no reference to the real estate, but only to such personal property as remained on hand, in specie, out of which Dwight was to have seventy-five per cent. of its value.

Godfrey complains that this contract, as written, does |not contain the terms of the contract actually agreed upon, and prays that it be reformed. Zacharie's evidence, who was an interested party in all these contracts, being a creditor of Cowman & Co. to a large amount for advances for iron, freight, etc., for the road, and who was present when the contract was signed, says distinctly and positively, without any equivocation or mental reservation whatever, that a basis for a contract had been agreed upon by Godfrey and Dwight, and reduced to writing by Mr. Keating, the active manager, confidential agent

and counselor of Dwight. That basis is Exhibit E, and is as follows:

" Mr. Dwight requires:

"*First.* That you (Godfrey) transfer to him your individual property.

"*Second.* That you transfer the property of A. T. Cowman & Co.

"*Third.* That you transfer the benefits of the contract of A. T. Cowman & Co.

"*Fourth.* That you authorize him to receive all cash, stock, bonds, etc., coming from the company.

" In return, Mr. Dwight agrees:

"*First.* To advance the funds necessary to build the road as needed.

"*Second.* To use the securities, as he would his own means, to the best advantage.

"*Third.* To pay over to B. Godfrey one-fourth of all profits remaining after the completion of the road, and the payment of liabilities accrued under the contract of A. T. Cowman & Co.

"*Fourth.* In case there are any profits, and the property of B. G. is not needed to complete the road, to re-deed to B. Godfrey his individual property.

" In addition to the above, and as part of the arrangement:

"*First.* Mr. Dwight is to have control of the directory.

"*Second.* The company are to give $50,000 in bonds and $250,000 in stock additional to amount now provided for under the contract of A. T. Cowman & Co., which is to go directly to Mr. Dwight."

Zacharie's testimony is full to the point, that these were the terms, and the only ones, agreed upon by the parties. That Godfrey had neither time nor opportunity allowed him to examine the contract as expanded by the scrivener into the dimensions it now has, when the signature of the parties to this writing, with a date to it, would have answered the purposes. It is clear and explicit, and contains, in itself, all that was necessary to be stated.

The contract has not in it the fourth item composing an essential and important part of this basis. That this was the understanding of the parties—that such was the contract—that the lands were to be re-conveyed to Godfrey—we have the positive testimony of Zacharie, uncontroverted. The fact that Dwight charged Godfrey with the payment of the taxes on them after the deed was made; the testimony of Mr. Breath, who says Keating said, Dwight was to re-deed the lands to Godfrey ; and a statement of Godfrey's, on his return, after the contract was made with Dwight, (and brought out by the defendants on their

cross-examination of Mr. Breath,) that Godfrey admitted he owned no property ; that he had conveyed it all to Dwight ; but when the road was finished, he was to have his lands again, if they were not used up in constructing the road.

We think the testimony is conclusive, on the point that the lands were to be re-conveyed to Godfrey; and so the contract should have stated, according to the terms of the basis agreed upon, and it must be so reformed. On the acceptance of the road by the railroad company, in September, 1852, or in April, 1853, when it was finally completed, Dwight should have rendered a full account of all his expenditures to Godfrey, and should have then paid over to Godfrey one-fourth of the profits on the work, and re-conveyed the land. He did not do so ; he rendered no account to Godfrey, kept all the profits, and the lands also, and conveyed them by an absolute deed, in 1854, to the Metropolitan Bank of the city of New York, in exchange for thirty bonds of $1,000 each, issued by the Southern Michigan Railroad. It is thus the bank becomes a party to this suit, and we are to inquire if the bank has any power to hold them.

The bank is organized under the general banking law of New York, passed April 18th, 1838. It being a creature of that act, from it all its powers must be derived. We have that act before us, in the form agreed by the parties to be used in this case. It is entitled " Cleaveland's Banking Laws of New York."

By section 24 of that act, it is enacted, (page 221,) It shall be lawful for such association to purchase, hold and convey real estate for the following purposes:

1. Such as shall be necessary for its immediate accommodation in the convenient transaction of its business ; or,

2. Such as shall be mortgaged to it in good faith by way of security, for loans made by or moneys due to such association ; or,

3. Such as shall be conveyed to it, in satisfaction of debts previously contracted in the course of its dealings ; or,

4. Such as it shall purchase at sales under judgments, decrees, or mortgages held by such association. The said association shall not purchase, hold, or convey real estate in any other case or for any other purpose ; and all conveyances of such real estate shall be made to the president, or such other officer as shall be indicated for that purpose in the articles of association ; and which president or officer, and his successors, from time to time, may sell, assign and convey the same, free from any claim thereon against any of the shareholders, or any person claiming under them.

By the deposition of Henry Meigs, the cashier of this bank, it appears, that by the fourth article of the articles of associa-

tion, " it was provided, that the president of the association, for the time being, shall preside at every meeting of the board, etc.; and he is hereby indicated as the officer to whom conveyances shall be made of real estate, to take, hold, and convey the same on behalf of the association, according to the provisions of the said act of the legislature."

Now, what explanation does the bank give of this transaction?

In their answer to the bill first filed by Wason, who was a judgment creditor of Cowman & Co., and which opened up this whole controversy, they state that these lands were conveyed to them by Dwight and Keating, for the consideration mentioned in the deed from Dwight, which Wason states in his bill to have been $95,000. In a subsequent part of their answer, they say that Dwight was indebted to them more than one hundred thousand dollars, and to secure this indebtedness, the bank had caused an attachment to be issued and levied on these lands; that before the levy, Dwight had conveyed the lands to Keating; that they were advised the conveyance was without consideration, and that the attachment would hold them; that afterwards, Dwight conveyed the lands to them in payment and satisfaction of these claims, and procured Keating to execute a deed of the same, and that they then dismissed the attachment. The bank further say, they purchased the said lands of Dwight for a full and valuable consideration, as above stated, without any notice, etc. In the answer of the bank to the first cross-bill filed by Godfrey, the bank alleges that they purchased the lands from Dwight for a full and valuable consideration, without notice, etc., as stated in their answer to Wason's bill, and refers to that answer as containing a full and particular statement of the consideration paid by them to Dwight.

On this answer, Godfrey amended his cross-bill, charging in it, that the bank held these lands as security merely, and called upon them to answer to that charge, and for what amount of indebtedness, and whether there was not an understanding that when Dwight paid the bank, the lands were to be re-conveyed, and that the bank should be required to apply the other securities they held of Dwight's, before they should be permitted to sell the lands.

To this amended bill the bank answers, in substance, that for the consideration of the conveyance of these lands by Dwight, and the purposes for which it was made, and the amount of Dwight's indebtedness to the bank when the deed was made, and the amount of securities it then held for such indebtedness, and of what they consisted,— and all agreements, contracts, and understandings between them and Dwight, concerning his indebtedness, the securities they held, and the conveyances for the lands,

— they refer to the deposition of Henry Meigs, Jr., (taken by Wason in the suit,) for the facts, and make that deposition their answer.

Now what does Mr. Meigs, the cashier, say? Mr. Meigs says, he has been the cashier of this bank since the fifth of April, 1853.

From his answers to the interrogatories, and from the several schedules he furnishes, (as explanatory of his testimony, and of the facts,) we should infer that the bank at no time purchased from Dwight these lands, or any portion of them; that they did not receive them in payment, or in satisfaction of any part of Dwight's indebtedness; that the bank has never credited Dwight for these lands upon his indebtedness. Schedule B, presented by Meigs, shows that the bank has continued to hold, and now holds, Dwight's paper for the greater part of his indebtedness, existing at the time of the conveyance, amounting to near two hundred thousand dollars, after allowing credits, and has continued to cast the interest upon it down to July 1, 1856, crediting only such cash receipts as they obtained from other collaterals, but not anything on account of these lands.

We infer further, from the testimony of Meigs, that the only consideration given by the bank for these lands, was the surrender to Dwight, on the 30th December, 1855, of thirty-three bonds of the Southern Michigan Railroad, for one thousand dollars each, and which bonds were held by the bank as collateral security for Dwight's note to the bank of thirty thousand dollars, given October 1, 1853. This is shown by the resolution of the board of directors of that date, which Meigs gives in his deposition. That resolution is as follows:

" *Resolved*, To give up to H. Dwight, Jr., thirty-three bonds of the Michigan Southern Railroad Company, of one thousand dollars each, on condition that he gives a full and satisfactory title to all the lands in Illinois attached by the bank."

In obedience to this resolution, these bonds were given up to Dwight, and he conveyed the lands to the bank by warranty deeds, as Mr. Meigs states.

From all that appears, the bank yet holds Dwight's note of $30,000, and has, ever since December 30, 1853, continued to cast interest upon it. It is the second item in Schedule B, and it does not appear that Dwight's account has been credited by the lands. It is certain they were not received in payment of the note, or it would have been surrendered. This transaction thus appears in Schedule C, attached to Meigs' deposition stating Dwight's account, under date of December 31, 1853: " Returned to H. Dwight, Jr., thirty-three bonds Michigan Southern

Railroad Company, $33,000, and received deeds of sundry parcels of land."

And under date of January 16, 1856, there is this entry :

" Securities now on hand — Alton City bonds, $57,000 — Chicago and Mississippi R. R. bonds, $101,000 — 1,100 shares Chicago and Mississippi Railroad stocks, $110,000 — deeds for sundry parcels of land."

We therefore infer that the bank neither purchased these lands from Dwight, nor did they take them in *payment*, or in satisfaction of any portion of Dwight's indebtedness.

We hold the conveyance of these lands was made to the bank, and are now held by them as one, among other collaterals, for Dwight's indebtedness, which existed prior to the execution of the deeds. It does not appear that any part of Dwight's indebtedness was created after, or upon the credit of either of these conveyances.

The legal propositions which flow from these facts will be now briefly stated.

It has been settled by the highest courts of the State of New York, that banking associations, organized under their general banking law, as this was, are corporations. *The People* v. *The Board of Supervisors of the County of Niagara*, 4 Hill, 20 ; *Gillet, Receiver, etc.*, v. *Moody*, 3 Comstock, 479.* †

This being so, this bank can exercise its faculties only in the mode and manner prescribed by the banking law. It is so with all bodies, officers, or persons, having a statutory existence only.

It was declared, in the case of *Head & Amory* v. *The Providence Insurance Co.*, 2 Cranch, 150 : In its corporate capacity a corporation is a mere creature of the act to which it owes its existence ; it may correctly be said to be precisely what the act incorporating it has made it ; to derive all its powers from the act ; and to be capable of exerting its faculties only in the manner that act authorizes.

This doctrine has been recognized and adhered to by all courts in this country, without any serious departure from it. 2 Kent's Com. 298 ; *Dartmouth College* v. *Woodward*, 4

---

* The notes to this opinion were prepared by John Cleveland, Esq., of the city of New York.

† See *Thomas* v. *Dakin*, 22 Wend. R. 9 ; *Bolander* v. *Stevens*, 23 Wend. R. 103 ; *Talmage* v. *Pell*, 9 Paige Ch. R. 410 ; *Parmly* v. *Tenth Ward Bank*, 3 Edw. Ch. R. 395 ; *Bank of Watertown* v. *Assessors of Watertown*, 25 Wend. R. 686 ; *Willoughby* v. *Comstock*, 3 Hill R. 389 ; *The People* v. *Supervisors of Niagara*, 4 Hill R. 20 ; the same case in 7 Hill R. 504 ; *Sagory* v. *Dubois*, 3 Sand. Ch. R. 466 ; *Leavitt* v. *Blatchford*, 3 Barb. S. C. R. 9 ; the same case (*Leavitt* v. *Palmer*) in 3 Comstock R. 19 ; *Gillet* v. *Moody*, 5 Barb. S. C. R. 185 ; the same case in 3 Comstock R. 479 ; *Talmage* v. *Pell*, 3 Selden R. 328, 340, 347 ; *Leavitt* v. *Yates*, 4 Edw. Ch. R. 134 ; *Gillet* v. *Phillips*, 3 Kernan R. 114.

Wheaton, 636; *Safford* v. *Wyckoff,* 4 Hill, 443; *Talmage* v. *Pell,* 3 Selden; 340.* These being the faculties of a banking association, under the general banking law of New York, the testimony of Meigs is quite satisfactory, that in taking these lands, being neither purchased, nor conveyed in satisfaction of debts previously contracted in the course of its dealings — nor purchased for their immediate accommodation in the convenient transaction of its business — nor purchased at sales under judgments, decrees, or mortgages held by the bank — nor mortgaged in good faith by way of security for loans made by, or money due to the bank — the bank has acted beyond the scope of its legitimate powers.†

We do not consider they were mortgaged in good faith, by way of security for loans made, or for money due the bank, for the reason the bank, in their answer, claimed to be a purchaser of the lands, for a consideration stated—and because the deeds, on their face, show they were such purchaser. It does not lie with them now to say that the deed was a mere security for money due. Dwight might so contend.

The spirit of our recording system requires that the record of a mortgage should disclose, with as much certainty as the nature of the case will admit, the real state of the incumbrance. If a mortgage is given to secure an ascertained debt, the

* That a statute corporation is confined strictly to the powers granted by the statute, see *Blakemore* v. *The Gla. Canal Nav. Co.,* 1 Mylne & K. 154; *The Queen* v. *The Eastern Co. Railway,* 10 Ad. & El. 546; *Ridley* v. *Plymouth Bank Co.,* 2 Exch. 711; *Kingsbridge Flour Co.* v. *The Same,* 2 ibid. 718; *Bank of the U. S.* v. *Dandridge,* 12 Wheat. 68, 69; *Beatty* v. *Lessee of Knowler,* 4 Peters, 168; *Bank of Augusta* v. *Earl,* 13 ibid. 587; *Runyan* v. *Lessee of Coster,* 14 ibid. 129; *The N. Y. Fire Ins. Co.* v. *Ely,* 2 Cowen R. 699; *The People* v. *The Utica Ins. Co.,* 15 John. R. 383; *Thompson* v. *Schermerhorn,* 3 Selden R. 92; *Bank of Michigan* v. *Williams,* 5 Wend. R. 482; *The Attorney General* v. *Oakland County Bank,* Walker's Ch. Mich. R. 97; *Wolf* v. *Godard,* 9 Watts, 555.

† It is a breach of trust for a corporation to transcend its powers. *Dodge* v. *Woolsey,* 18 Howard R. 231; *Rolf* v. *Rogers,* 3 Paige Ch. R. 154; *Gage* v. *Newmarket Railway,* 16 Eng. L. and Eq. R. 57, 64. On this ground, a corporation may be enjoined from doing an unauthorized act. *Attorney General* v. *Wilson,* Craig & Phil. 1. See, also, *Attorney General* v. *Utica Ins. Co.,* 2 John. Ch. R. 357; *The Same* v. *The Same,* 15 John. 358. Such unauthorized acts are adjudged to be illegal, both at law and in equity. Cases at law: *Lees* v. *The Proprietors, etc., of the Canal, etc.,* 11 East, 645; *The Queen* v. *The East County Railway,* 10 Adol. & Ell. 546; *East Anglian Railway* v. *The East Counties Railway,* 7 Eng. Law and Eq. R. 505; *McGregor* v. *The Official Manager, etc.,* 16 ibid. 180; *Gage* v. *The Newmarket Railway,* 14 ibid. 57; *The Mayor, etc.* v. *The Norfolk Railway,* 30 ibid. 120; *The Penn., Del., etc., Company* v. *Dandridge,* 8 Gill. and J. 248; *N Y. Fire Ins. Co.* v. *Ely,* 5 Conn. R. 567; *Hood* v. *The N. Y. and N. H. R. R. Co.,* 22 ibid. 502; *Bank of U. S.* v. *Owens,* 2 Peters' R. 527—538; *Bank of Chilicothe* v. *Swayne,* 8 Ohio R. 257. Cases in equity: *Blakemore* v. *The Glamorganshire Canal, etc.,* (Lord Eldon,) 1 M. and Keene, 154; *The Attorney General* v. *Corporation of Norwich,* 16 Simons' R. 225; *Coleman* v. *East Counties Railway,* 10 Beavan, 1; *Beman* v. *Rufford,* 6 Eng. Law and Eq. R. 106; *Kohen* v. *Wilkenson,* 13 Jurist, 641; the same case in 14 Jurist, 491; *Talmage* v. *Pell,* 3 Selden, 328; *Bank Commissioners* v. *St. Lawrence Bank,* 3 ibid. 513; *Solomons* v. *Laing,* 12 Beavan, 339.

amount of that debt should be stated; and if it is intended to secure a debt not ascertained, such data should be given respecting it, as will put any one, interested in the inquiry, upon the track leading to a discovery. If it is given to secure an existing, or a future liability, the foundation of such liability should be set forth. *North* v. *Belden,* 13 Conn. 376; *Hart* v. *Chalker et al.,* 14 ib. 77.

It must be remembered that these moneys, claimed to have been loaned by the bank to Dwight, have no connection whatever with the construction of the Alton and Sangamon Railroad, for which Godfrey was the contractor; nor did the moneys inure to Godfrey's benefit in any manner.

The first loan to Dwight, it appears from the testimony, was not made until June, 1853, nearly a year after the completion of that road, and at a time when, as this record shows, Dwight was in debt to Godfrey upwards of one hundred thousand dollars, being his one-fourth share of the profits on that road, and for which Dwight failed to render any account.

The note of Dwight, to secure which he pledged the thirty-three bonds of the Southern Michigan Railroad, was not given to the bank until the first of October, 1853, and not until December 31st were these bonds given up for the deeds for these lands.

We cannot hold the bank to be a purchaser of these lands in good faith, and for a valuable consideration, even if, under the general banking law, they had the power to purchase. It was not good faith to take an absolute conveyance of the lands, when a mortgage only was intended. *Sanford* v. *Wheeler,* 13 Conn. 165; and the case in 14 Conn., before cited, *Hart* v. *Chalker et al.*

These deeds did not disclose the true nature of the transaction between Dwight and the bank, and were calculated to impose upon and mislead all who might be induced to deal with the property; and at the very time the deeds were made to the bank, they held other securities of Dwight, amply sufficient to satisfy his whole debt.

The authorities are conclusive upon the point, and reason speaks the same language, that taking an absolute conveyance, and attempting to set it up as a purchase, when, in truth, it was a mere security for a debt, will, under most circumstances, be regarded as a fraud, and would prevent the party from claiming as a *bona fide* mortgagee.

The case of *Sanford* v. *Wheeler,* before cited, is to this effect—and so is the case of *Moore* v. *Payne,* 3 Alabama, 444. Surely, it cannot be considered as good faith, to insert in a deed a consideration of ninety-five thousand dollars, when the real

and only consideration was the surrender of thirty-three railroad bonds, of one thousand dollars each, and their value not shown, and which were held as collateral security for a note of but thirty thousand dollars.

Nor do we conceive it fair and honest, in an answer to a bill in chancery, when the facts are demanded, to aver that the lands were conveyed in payment and satisfaction of the entire claim the bank had on Dwight, when the truth was, as shown by Cashier Meigs' deposition, that the bank yet holds their claim against Dwight, in nowise satisfied or credited by these lands. In equity, if Dwight should pay this note of thirty thousand dollars, then it is apparent the deeds would be without consideration, and Dwight might claim a re-conveyance of the lands. If this note was paid by Dwight, the deeds would be inoperative, as voluntary conveyances, without consideration, and the land be subject to Godfrey's equity under his contract with Dwight, or as his creditor, to an amount exceeding one hundred thousand dollars, for which he has a decree, not excepted to by Dwight.

There is another difficulty in the way of the claim now set up by the bank to hold these lands as a security for the note of thirty thousand dollars.

It is this: the proofs in the cause show that the bank has sold and conveyed away a portion of these lands, thus depriving them of the power to restore the fund as it was when they received it as security. This, of itself, is conclusive that the bank did not treat the conveyances as a mortgage or security for a debt; and after treating the land as their own property, it is now too late, when they cannot re-convey the property, or restore the fund as it was, to claim that the instrument was a mortgage.

Though Dwight might claim the conveyances were intended to be a mortgage, the bank cannot—the bank cannot put their own estimate on the mortgage property, and sell and dispose of it, and then state, as they choose, the balance due, without judicial inquiry. *Lockridge* v. *Foster et al.*, 4 Scam. 574.

Nor do we regard it as good faith, fair and honest, after the original bill was filed in 1855, by Wason, alleging the conditions on which Dwight held the real estate, and making Dwight and the bank parties, that the bank should, in January, 1856, enter into an agreement with Dwight to sell these lands, and make Dwight's debt out of them, as appears from the deposition of Meigs and Schedule E, they did do; the more especially as the bank had at that very time collaterals deposited by Dwight, of which his debt could be made.

Nor was it good faith on the part of the bank to deal with

these lands as their own, absolutely, and make sales of a portion of them, when, as now claimed by the bank, they were merely security, and taken in exchange for other securities delivered up to Dwight.

Nor do we consider the bank a purchaser for a valuable consideration, for it is not shown that they advanced any new consideration beyond Dwight's original indebtedness for the lands — or relinquished any securities they held for such indebtedness. Receiving a conveyance merely in payment of a pre-existing debt is not sufficient where there is a collision of *bona fide* claims.

In the case of *Dickerson et al.* v. *Tillinghast et al.*, 4 Paige Ch. 215, it was held, to constitute a *bona fide* purchaser, for a valuable consideration, within the meaning of the recording act, he must, before he had notice of the prior equity of the holder of an unrecorded mortgage, have advanced a new consideration for the estate conveyed, or have relinquished some security for a pre-existing debt due him. The mere receiving a conveyance in payment of a pre-existing debt, is not sufficient. Therefore, where the owner of a lot of ground gave a mortgage on it to one who neglected to have his mortgage recorded, and afterwards, and before the mortgage was recorded, the mortgagor conveyed the premises to another who had no notice of the mortgage, in payment of a precedent debt, the court held this purchaser was not a *bona fide* purchaser, for a valuable consideration, within the meaning of the recording act, so as to give him a preference over the prior unrecorded mortgage.

The case of the *Manhattan Co.* v. *Evertson*, 6 ib. 457, recognizes the same principle, and so does the case of *Brown* v. *Welsh*, 18 Ill. R. 343, decided by this court.

These lands are not shown, as we have already remarked, to have been received in satisfaction of a pre-existing debt, or any credit entered on that debt for the lands ; nor is there any proof that the railroad bonds, which were surrendered, were of any value. In answering the special interrogatories as to the consideration, the bank failed to show any value paid by them for the lands.

The case of *Brown* v. *Welsh,* in this court, holds that a party who claims to be a purchaser for a valuable consideration must aver and prove what the consideration was ; how and when it was paid ; and if in something other than money, he must show its value. It is not for the court to infer it was valuable. 18 Ill. R. 347.

As to the notice, all the testimony taken to that point shows that Godfrey was in possession of some of the most valuable portion of the lands, which were in an improved condition, and

paid taxes on all unimproved at the time Dwight and Keating conveyed to the bank, and during all the time subsequent to the date of his conveyance to Dwight. Such possession we have repeatedly held evidence of notice of some right, or some equity in the party in possession, sufficient, at least, to put persons interested upon inquiry as to the terms under which he holds this possession.

The possession being adverse to the claim of title set up by Dwight when he conveyed, his vendee, the bank, is presumed to have taken the conveyance subject to whatever claim or title upon which the possession may be founded. *McConnel* v. *Reed,* 4 Scam. 123 ; *Dyer* v. *Martin et al.,* ib. 151.

In *Williams* v. *Brown,* 14 Ill. R. 205, we say: A person who buys land in possession of another, is bound to inquire of the person in possession, by what tenure he holds possession, and what interest he claims in the premises. See also *Pretty-man et al.* v. *Wilkey et al.,* 19 ib. 241. So it is held that possession of lands by the grantor in a deed, absolute on its face, but intended as a mortgage, was notice, to a purchaser from the grantee, of the equities of the grantor. *Wright* v. *Bates and Niles,* 13 Vermont, 350 ; *Roberts* v. *Anderson,* 3 Johns. Ch. 380–1 ; *Grimstone* v. *Carter,* 3 Paige's Ch. 437.

In *Buck* v. *Holloway's Devisees,* 2 J. J. Marshall, 180, the court say, the only sensible rule is, that actual residence upon the land is notice to all the world of every claim which the tenant may legally assert in defense of his possession.

It is insisted, however, by the counsel of appellant, that the only notice the bank had of Godfrey's equities is this possession by Godfrey of some of the lands when the bank took the conveyance, and that was limited to a very small portion of the several parcels conveyed by the deed—that much the larger part was occupied by Godfrey's tenants, under leases given by Godfrey before he conveyed to Dwight, or was unoccupied land.

It is true, Godfrey was in actual possession of the Monticello property only, being his homestead, and of other farms by his tenants, and had no actual possession of the uncultivated lands, but after making the conveyance to Dwight, and the several contracts of the same date, his position in regard to all the property was in no respect altered, and he claimed at all times that all the lands were to be re-conveyed to him.

The bank dealing with these lands, and seeing Godfrey in the actual possession of the most valuable portion of them, and the unchanged position he occupied with regard to all of them, and paying taxes upon them, was put upon the inquiry—How is all this ? We see, Mr. Dwight, your grantor is in the undisputed possession of the most valuable part of this property, and leas-

ing other portions of it, and paying taxes on all of it. We must inquire into this.

Had the bank inquired, the equities of Godfrey would have doubtless been fully stated to them ; but they made no inquiry, nor did they do any act to put Godfrey upon resistance. The attachment suit, which he could have enjoined and shown his equities, was dismissed. It was not until Wason's bill was filed, in 1855, to subject these lands to the payment of his judgment, that Godfrey was called upon to act. And he is charged by appellant with failing to set up his claims in his answer to that suit. We do not think he was called upon to do so.

The charge in the bill was a fraudulent conveyance of these lands to Dwight. It was only necessary, therefore, for Godfrey, at that stage of the proceeding, to repel the charge of fraud ; but when the bank set up their claims by their answer, then Godfrey filed his cross-bill, setting out his equitable rights, and then, and at that time, was the only occasion he had for such showing. He is in no sense chargeable with having acquiesced in Dwight's claim to hold these lands, for he was in no condition to act in respect to them, until action was commenced by parties interested against him. He reposed upon his possession, which was visible, open and adverse ; upon his unchanged position in respect to all the lands, and could not have supposed a claim was set up to them until it was actually preferred and insisted upon by the bank. It is in vain to say, the bank had not notice sufficient to put them on inquiry, the result of which probably might have induced them to decline having anything to do with them.

It is true, as contended for by appellant, under the contract between Godfrey and Dwight and the deeds, Dwight had a right to sell the lands conveyed, but *sub modo* only, if we understand the nature of the contract, and as we have explained it. What was the object of conveying the lands ? Certainly nothing more than to hold them as a reserved fund ; and if all other resources failed, then to sell them to complete the road. It cannot be contended they were a gratuity—a boon bestowed by Godfrey on Dwight, when available securities had been transferred to him, amounting to fifteen hundred thousand dollars, to finish a road eighty miles in length, of which two-thirds was completed at a cost of not more than six hundred thousand dollars. No sane man would have bestowed such a boon for such a purpose, and no court would enforce such a contract, on the ground that it is unconscionable.

The clear import of all the contracts made on the 3rd of October, 1851, and they must all be taken together, as being in *pari materia*, is, that the securities were to be used only except

Metropolitan Bank *v.* Godfrey et al.

in case of deficiency, when the lands should be converted into money. Dwight was not a trustee to sell, for any purpose, except to raise means to finish this particular road.

It is objected, that the cross-bill of Godfrey does not pray to reform the contract with Dwight. It does not, in terms, so pray, but the whole case proceeded on the assumption that there was a mistake in the contract, and the proof of it, we think, is entirely sufficient. It is clear and strong, and entirely satisfactory, and accounts for the fact that Godfrey did not examine it closely. He was assured, in the hurry of its execution, that whatever was not right in the contract, as signed, should be made right. Godfrey was then under arrest, in a strange city, far from home and friends, on account of debts contracted for this road, and was in a state of financial exhaustion, when Dwight stepped in with his project, as drafted by Mr. Keating, his confidential agent, and which was agreed to by Godfrey. It was this contract, or nothing, and Godfrey was induced to sign without examination, he supposing that it contained the terms agreed upon.*

There is nothing to impeach Zacharie's testimony, but all the facts confirm it, and strengthen it.

But, if we be in error in these views, as to the right of the bank to hold these lands, there still remains an insuperable objection thereto. No power has been granted by the act of assembly before cited, to the bank, to take and hold land in its corporate name. We have referred to the doctrine of the exercise of power by a corporation, and have shown that, as they are the mere creatures of the act giving them an existence, and bestowing upon them faculties, they cannot exercise those faculties except in the manner authorized by the act.†

* As to the power of a court to reform a contract, see *Leavitt* v. *Palmer,* 3 Comstock R. 19, 38, 39, and the cases there cited and commented upon. 1 Story Equi. Jurisp., sections 114, 115.

† There is no color for saying that the Metropolitan Bank could lawfully do, in Illinois, what it was not authorized, by the general banking law, to do at home. The powers of every statute corporation being derived from the act by which it is created, every person who deals with it, abroad or at home, is bound to know the extent and limit of such powers. *Root* v. *Godard,* 3 McLean R. 102 ; *Hayden* v. *Davis,* 3 ibid. 276 ; *Foot* v. *Wallace,* 4 ibid. 8 ; *East Anglian Railway* v. *East Counties Railway,* 7 Eng. Law and Eq. R. 505 ; *Mumma* v. *Potomac Company,* 8 Peters' R. 287 ; *Runyan* v. *Lessee of Coster,* 14 Peters' R. 122 ; *Broughton* v. *Salford Water Works,* 3 B. and Ald. 1.

This principle applies to persons who deal with such a corporation out of the State creating it, as well as to those who deal within such State. It is obvious, that the powers of a corporation are no greater beyond the jurisdiction of the State which creates it, than they are within that jurisdiction. See cases above cited.

As the law of the domicil of a corporation determines its corporate capacity, that cannot be enlarged by sending agents into a foreign State to make contracts in its behalf. A corporation is clothed everywhere with the character and powers given to it by the statute creating it—and when such statute is a public law, it is notice to the world, in all cases where a corporation exceeds its powers. In the *Bank of Augusta* v. *Earle,* 13 Peters' R. 519, it was adjudged, that a corporation

39

The act creating this corporation, directs that the corporation shall indicate some one of its officers in whose name, and to whom, all conveyances of real estate shall be executed; and the facts show, that by a resolution of its board of directors, the president of the corporation was so indicated. To that officer, and to him only, can such conveyances be executed. There is no power existing in the bank to take lands in its corporate name, and the conveyance to it cannot be sustained. We do not regard it as a case of misnomer, but as a question of power.

No power has been granted to the Metropolitan Bank to be, by its corporate name, the grantee of lands. It is indispensable to the validity of such conveyances, that they should be made to the officer indicated by the bank. That functionary alone has the capacity to take lands conveyed for the use of the bank.

We, therefore, decree, that the deeds for the lands conveyed to the Metropolitan Bank, by Dwight and Keating, are inoperative and void, and the same are hereby canceled. That the lands, by the terms of the contract, as we have reformed it, between Godfrey and Dwight, revert to Godfrey, and are subject to the satisfaction of Wason's judgment, and that Michael G. Dale, of Madison county, be, and he is hereby appointed a commissioner to convey said lands to said Godfrey, on his demand of a conveyance for the same.

*Decree affirmed.*

WALKER, J. I fully concur in the conclusion, but not in all the reasoning of the foregoing opinion.

CATON, C. J. In reference to the question arising upon the conveyances made by Dwight to the bank, I wish to state, that I think it is satisfactorily shown in the opinion, that the bank possessed no legal capacity to receive the conveyance of real estate, in its corporate name, and that the conveyance was

---

can make no contract, and can do no act, within or without the State which creates it, except such as are authorized by its charter. The officers or directors of a corporation are not the corporation, (*Bank of the United States* v. *Dandridge*, 12 Wheaton, 64,) but merely its agents, and are such agents only while acting within the legitimate scope of the powers conferred by its charter and in the business thereby authorized. *Hartford Bank* v. *Hart*, 3 Day, 495. In the language of Knight Bruce, L. J., (7 Railway Cases, 593,) the directors of a railway corporation "are, in a sense—no unimportant sense—trustees of their functions and powers for the shareholders, and perhaps also for society at large—certainly for the shareholders."

"If the directors have no authority," says Maule, J., (7 Railway Cases, 593,) "to enter into the contract, their act is not that of the company—it is no contract as regards it. The directors are authorized to do certain things for a particular object; if they do acts beyond that object, though under the corporate seal, it would not be the act of the company." See, also, *East Anglian Railway* v. *Eastern Counties Railway*, 7 Railway Cases, 155–157. Opinion of Jervis, C. J.; also, *McGregor* v. *Dover and Deal Railway*, in the Court of Exchequer Chamber, 7 Railway Cases, 227, 230; also pp. 592, 593, 600, 601.

absolutely void for want of a grantee capable of taking and holding the land. The law not only failed to confer upon the bank the power to take the deed, but it impliedly forbid it to receive the conveyance, by expressly directing that it should be given to another.

This, in my judgment, disposes of the whole of that branch of the case, and supersedes the necessity of considering the other questions which would have arisen had the conveyance been made to a party capable of receiving it.*

---

* When a power is created, or its exercise is regulated by statute, the authority
must be strictly pursued in all respects, or the attempted execution will be void.
1 Story's Equi. Jurisp., sections 96, 107 ; *Bright* v. *Boyd*, 1 Story R. 478 ; *Vielie* v:
*Osgood*, 8 Barb. S. C. R. 133 ; *Voorhees* v. *Pres. Church, etc.*, 8 ibid. 149 ; *Atkins* v.·
*Kiernan*, 20 Wend. R. 241 ; *Owens* v. *Hull*, 9 Peters, 607–623 ; *Williams* v. *Peyton,*
4 Wheat. 479.

This principle applies to every individual, or body, whose powers are conferred,
or regulated by statute. Cowen and Hill's Notes to Phil. Ev. p. 1288, 1289, 1290 ;
*Sharp* v. *Johnson*, 4 Hill, R. 92 ; *Sharp* v. *Spier*, 4 ibid. 76 ; *Denning* v. *Smith*, 3
John. Ch. R. 332, 334 ; *Sherwood* v. *Read*, 7 Hill, R. 431 ; *Powell* v. *Tuttle*, 3 Comstock, R. 396.

The like principle, in substance, applies to conventional powers. 1 Story Equi.
Jurisp., section 97 ; 1 Sug. on Powers, 6th Lond. Ed. p. 264, 268, 334, 341 ; *Roseboom* v. *Mosher*, 2 Denio R. 61.

A corporation is deemed to be domiciled in the country from which it derives
its existence, (*Louisville Railway* v. *Letson*, 2 How. R. 497 ; Grant on Corporations,
200, 201) ; but its corporate capacity will be determined, even in a foreign country,
solely by the statutes of the State creating it; such statutes having force there,
only by the comity of nations. Story's Conflict of Laws, 2nd Ed., sections 37, 38,
notes 1, 2 ; *Bank of Augusta* v. *Earle*, 13 Peters, 519, 587, 588 ; *Runyan* v. *Lessee
of Coster*, 14 Peters, 122.

All contracts of a statute corporation, beyond the scope of its capacity and
power, are impliedly prohibited. *Expressio unius est exclusio alterius.* Dwarris on
Stat. 713 ; Broom's Leg. Max. 278, 285 ; *People* v. *Utica Ins. Co.*, 15 John. 383 ;
*N. Y. Fire Ins. Co.* v. *Ely*, 8 Cowen, 699 ; *North River Ins. Co.* v. *Lawrence*, 3
Wend. 482 ; 1 Paine R. 406· ; 5 Cowen R. 572 ; 4 Price, 65 ; 3 Bing. N. C. 85 ;
30 Eng. Law and Equi. 127.